Filed 3/29/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| T. J.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>     Real Party in Interest. | A153034<br><br>(San Francisco City & County Super. Ct. No. JD 16-3266 A & B) |

In August 2016, T.J. (Mother), who is intellectually disabled, was raising three boys, ages eight, four and two, single-handedly, as their father lived separately, uninvolved in their upbringing. The family came to the attention of the San Francisco Human Services Agency (Agency) because Mother had not been giving the eldest boy medications he needed for severe asthma, eczema, and environmental allergies. A home visit by the Agency's social workers showed the children were living in unsanitary conditions, and all three were detained, jurisdiction was assumed, and reunification services were ordered for Mother.

Services were terminated for Mother in November 2017, and the court set a hearing under Welfare and Institutions Code[1] section 366.26. Mother seeks writ relief, claiming she was not provided reasonable reunification services and the judge abused his

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

discretion in terminating services and setting the hearing. Because Mother was waitlisted for a significant time on critical components of her case plan—individual therapy, in-home counseling, and parenting education—and was provided no assistance with in-home support services, anger management or housing, we conclude there was not substantial evidence the Agency had provided or offered reasonable services to Mother designed to address her special needs. We therefore grant the petition.

## I. BACKGROUND

A. *Detention: The Circumstances that Led to the Agency's Involvement*

On August 4, 2016, the Agency received a referral from hospital staff for general and medical neglect of Mother's eight-year-old eldest son. Upon investigation, the Agency determined the eldest boy had a complicated health regimen of eight separate prescribed medications that had to be administered daily, some in pill form, some topical, and some inhalers, in some cases several times a day, as well as additional over-the-counter medicines as needed. Mother was not administering prescribed medications to him and had failed to pick up his medications from the pharmacy.

Mother also reported their home in public housing had bed bugs, cockroaches, mold, and a hole in the ceiling. The eldest boy had a serious allergy to dust mites, and hospital staff explained to Mother how to change the household environment to lessen his exposure, but Mother was unable to implement the recommendations. A report came in to the Agency the next day saying the family's home had been condemned a year previously. Mother was asked to leave her unit but refused. The reporting party said Mother refused to allow the housing authority into her unit to make repairs. According to this reporter, Mother was being followed by Family Mosaic Program,[2] and she had not

---

[2] Family Mosaic Program was a program operated by the Department of Public Health which provided "Mental Health treatment, intensive case management and other service interventions for children with serious emotional problems who are at risk of out-of-home placement or who have already been removed and placed out of their homes."

allowed this service into the home for some time.

Social workers from the Agency met with Mother on August 22, 2016 at her home. The home was extremely dirty, cluttered with food and trash, and smelled of mold. The two-foot by three-foot hole in the ceiling had mold and water damage. The social workers concluded Mother's living conditions were dangerous to the health and safety of the children. They collected the children and removed them from Mother's home that day. On August 25, 2016, the three boys were formally detained by court order and placed in foster care.

B. *Jurisdiction and Disposition*

Between detention and disposition on September 29, 2016, all three children were moved from foster care to their maternal grandmother's (MGM) home. By the disposition hearing, the eldest boy's health had stabilized in MGM's care, and the middle boy's potty-training, which had been delayed, had normalized.

The disposition report notes "[t]his is the case of an African American family comprised of [a] single mother, [T.J.] (age 34), and her three children . . . [ages eight, four and two]. The alleged father . . . is in custody awaiting trial . . . ." The report discusses Mother's mental health problems and the family's prior child welfare history. That history included a number of unsubstantiated referrals, though there was an incident in 2012 which led to dependency proceedings in which the two older boys were removed from their parents' care after it was reported Mother choked one of the boys, requiring hospitalization.

Following her sons' detention in 2012, Mother participated in family reunification services, reunified in July of 2013, and received family maintenance services until June of 2015, when the case was closed. In the course of this prior dependency, Dr. Amy Watt diagnosed Mother with depressive disorder NOS, "mild mental retardation," and personality disorder NOS. Mother reportedly had an IQ below 70, with impaired

(<https://bayviewci.org/programs-with-partners/mental-health-and-substance-abuse-services/153-2/> [as of Mar. 29, 2018].)

3

adaptive functioning, impaired interpersonal relationships, and "serious anger issues." Dr. Watt said Mother had prior mental health issues dating back to her childhood and claimed to have been hospitalized more than 16 times as a teenager due to anger management problems.

By late September 2016, Mother had vacated her public housing apartment to allow repairs to be made. The disposition report indicated the work was supposed to be finished by the end of September 2016. In the report, the social worker opined Mother would need ongoing services from Golden Gate Regional Center (GGRC) and specialized service providers until the boys turned 18. She recommended GGRC's Apple Family Works (AFW), which offered in-home parenting and counseling services. Mother was expected to work with a provider of in-home support services to learn life skills needed for independent living and caring for her sons. The Agency had no concerns about a drug or alcohol problem for Mother. She had a minimal juvenile delinquency history and no adult criminal history. The report noted domestic violence was not an issue because Mother and the children's father had separated in 2014. Nevertheless, the social worker expressed skepticism from the outset that Mother would succeed in reunifying with her sons.

At the jurisdiction/disposition hearing on September 29, 2016, Mother submitted to a section 300, subdivision (b) allegation that she "requires the Agency's assistance in providing adequate care and supervision of the children in that she has mental health and developmental disabilities that impede her ability to care for the children." That was the only sustained allegation against Mother; the remaining allegations against her were stricken. At the conclusion of the hearing, the court ordered reunification services for Mother and out-of-home placement for the children in the care of MGM. The court also ordered therapeutic visitation for Mother and the boys.

C. *Mother's Orders at Disposition*

The specifics of Mother's court-ordered case plan were as follows. She was directed to (1) reactivate her GGRC case management services to attain deeper knowledge and demonstrate understanding of her independent living needs;

4

(2) participate in GGRC long term case management and follow up with the recommended treatment plan; (3) participate in individual therapy and follow recommended treatment, which could include a medication evaluation; (4) engage in anger management services or address anger management as a part of the mental health treatment plan; (5) participate in family therapy through the Infant Parent Program (IPP) with the two younger boys and family therapy with the eldest boy, to get support with the ongoing mental health needs of her children; (6) get access to AFW through GGRC, complete the program and allow the child welfare worker and other in-home support providers to assess how effectively she was applying the program's parenting skills; (7) work with the child welfare worker to enroll in an in-home supportive services program, complete an assessment, and follow recommended assistance in activities of daily living such as cleaning, laundry, shopping, cooking, washing dishes, bathing, grooming, dressing, and getting transportation to appointments; and (8) secure housing and keep the home clean and organized.

D. *The Six-Month Review*

The Agency filed a status review report on March 8, 2017, in connection with the six-month review hearing held on March 28, 2017. For that review, the Agency recommended an additional six months of reunification services for Mother, with the children remaining in the care of MGM.

Mother's housing remained "unstable." She had been informed her public housing apartment would not be in move-in condition until May 2017, her primary housing was being rebuilt. She was living with two different people in the meantime, but she would not allow the Agency to visit her temporary home. She said she did not want to disturb her roommates. The social worker asked Mother if she would be willing to move in with MGM should she reunify with the boys, and Mother said she was only open to that arrangement on a temporary basis.

Mother was on target with therapeutic visitation with her sons. She began participating in the IPP with her youngest son in November 2016. Beginning in January 2017, Mother received clinically supervised visits with the two older boys. Once IPP

5

ended, the clinically supervised visits expanded to include the youngest boy.  Mother was prompt and engaged in these visitation services.  The children were doing well in the home of MGM.  The eldest boy's asthma had stabilized and overall he was in good health.  He was doing well at school and received individual therapy there.  His school social worker thought the structure and stabilization in MGM's home had caused a big improvement in his behavior.  The youngest and middle boys attended daycare and preschool, respectively, and there were no reported concerns.

At the six-month status review hearing, the court followed the Agency's recommendation and ordered six more months of reunification services for Mother.[3]

E.  *The 12-Month Review: The Court Terminates Reunification Services and Sets a Hearing Under Section 366.26.*

The court set a contested 12-month review hearing for November 17, 2017—15 months from detention—after Mother filed a hand-written declaration in September 2017 stating, "to who this may concern it is time for my kids to come back home[.]"  In this barely intelligible declaration, Mother said "I have been doing my case plan" but "everyone have been disrespect[ing] me[.]"  She also appeared to dispute what the Agency "put down on the court papers" about her living conditions and to request a "chance to speak in court."

A few weeks earlier in September, the Agency had filed a 12-month status report reporting that Mother was not able to live in her public housing unit and that her temporary housing remained largely inaccessible to its social workers.  According to the Agency, Mother only allowed the Agency to visit the temporary unit where she lived one

---

[3] The Agency points out that Mother did not challenge earlier orders or findings by direct appeal and therefore has waived any complaints about services predating the orders at the six-month hearing on March 28, 2017.  (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811–812.)  But here, the delays and non-provision of services continued well into the six- to 12-month period.  Although we may be foreclosed from granting relief for delays occurring before the six-month review, we do not believe we are compelled to ignore that period entirely.  When discussing the timing of the provision of services during the period under review, we may consider delays that spilled over from a prior period and compounded the overall problem with untimely delivery of services.

time in the spring of 2017, and the social worker who saw it noted there were no furnishings and no food in the refrigerator. It was a two-bedroom apartment, and Mother had only a roll-out bed and a few articles of clothing in the closet.

The children were doing well in MGM's care and were up to date on their medical and dental appointments. The eldest boy was succeeding academically, and had made tremendous growth in the past school year. There was noticeable improvement in his eczema and asthma. Importantly, he was by then able to administer his own asthma and eczema medications. The two younger boys were also both doing well at their respective schools. The middle boy had made major gains in speech therapy and was ready to start kindergarten.

The Agency concluded its 12-month status report with a recommendation that services be terminated and that a section 366.26 hearing be set. The concurrent plan for the children was adoption with MGM. As of the hearing, however, the eldest boy wanted to return home to Mother.

At the 12-month contest, the court took testimony from Mother and from the Agency's family reunification case worker, and admitted into evidence the Agency's 12-month status report. At the end of the hearing, the court sustained the Agency's position, finding by clear and convincing evidence that reasonable services had been offered or provided to Mother. The court determined Mother's progress toward alleviating the conditions that led to the children's placement was adequate, but nonetheless found she was unlikely to be able to reunify with her children within the next three months. It thus terminated services to Mother and set a section 366.26 hearing for March 13, 2018. We ordered that hearing stayed on March 6, 2018.

## II. DISCUSSION

A. *Mother's Contentions*

Although Mother's petition does not comply with rule 8.204(a)(1)(B) of the California Rules of Court, her contentions may be distilled into several specific complaints scattered throughout her presentation. First, she complains of delays in providing her with individual therapy and other services. She also argues services were

7

not tailored to her individual needs due to her developmental disability and history of mental health issues. She complains she never completed a parenting course. She contends some of the problems for which she was faulted, such as the hole in her kitchen ceiling and the rundown, moldy condition of her apartment, were in fact the responsibility of the housing authority, which failed to maintain her home in good repair. Underlying Mother's petition runs a thread that her problems raising her children were due in large part to poverty (e.g., lack of furniture, little food in the house), disability, and the inherent challenge in providing proper care for her medically fragile children. She crystallizes her complaints under one overarching claim of legal error: she was denied adequate reunification services.

B. *The Substantial Evidence Standard of Review Must Be Applied Bearing in Mind the Clear and Convincing Evidence Standard that Applied at Trial*

The juvenile court's finding that reasonable services were provided is reviewed for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*).) Substantial evidence is that which is reasonable, credible and of solid value. (*Ibid*.)

Mother emphasizes, however, the reasonable services finding must be made by clear and convincing evidence in the trial court. (§ 366.21, subd. (g)(1)(C)(ii) ["The court shall not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian."].) Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.) It must be " ' "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 971.) This does not mean a different standard of review applies, but it makes a difference in *how* the standard of review is applied.

The Courts of Appeal do not speak with one voice in describing how the substantial evidence standard is to be applied in dependency cases when the clear and convincing standard of proof was required at trial. Some cases hold the clear and convincing standard " ' "disappears" ' " on appellate review. (E.g., *In re Alexzander C.*

8

(2017) 18 Cal.App.5th 438, 451 [removal order]; *In re J.S.* (2014) 228 Cal.App.4th 1483, 1493 [dispositional findings]; *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880–881 [bypass findings].)  Others suggest we conduct our substantial evidence review " 'bearing in mind' " the heightened standard of proof.  (E.g., *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 [removal order]; accord, *Alvin R.*, *supra*, 108 Cal.App.4th at p. 971 [reasonable services finding]; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 [removal order].)  It is a nuanced distinction but one that can make a difference in a close case like this one.

We believe the correct standard requires us to bear in mind that clear and convincing evidence was required in the trial court.  In a closely related context, our Supreme Court has adopted the view that the clear and convincing evidence standard is incorporated into the substantial evidence standard of review.  (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [termination of parental rights under Civ. Code, former § 232].)  As pointed out in *Angelia P.*, incorporating the standard of proof into the standard of review also comports with the usual way we assess the sufficiency of the evidence in criminal cases, where a heightened standard of proof is required.  (*Angelia P.*, at p. 924, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [beyond a reasonable doubt standard incorporated into review for sufficiency of evidence]; *In re Matthew S.* (1988) 201 Cal.App.3d 315, 321 [citing *Jackson*].)

But even if not compelled to follow *Angelia P.*, we choose to follow the "bearing in mind" approach so our reviewing function is not eroded.  If the clear and convincing evidence standard "disappears" on appellate review, that means the distinction between the preponderance standard and the clear and convincing standard imposed by statute is utterly lost on appeal, an outcome we believe undermines the legislative intent as well as the integrity of the review process.  Decades ago, *Santosky v. Kramer* (1982) 455 U.S. 745 held the clear and convincing evidence standard was essential as a matter of due process where termination of parental rights was concerned.  (*Id.* at pp. 747–748.)  In so holding it emphasized that the clear and convincing evidence standard "conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to

9

satisfy due process." (*Id.* at p. 769.) It thereby impresses upon the factfinder the gravity of the decision he or she is called upon to make. (*Id.* at pp. 764–765.) If that standard is ignored on appeal, the heightened standard of proof applied in the juvenile court loses much of its force, or at least the ability of the appellate court to correct error is unacceptably weakened. That approach, in our view, is inimical to the legislative scheme in dependency proceedings.

Hence, "[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard*." (*In re Isayah C.*, *supra*, 118 Cal.App.4th at p. 694; see also *In re William B.* (2008) 163 Cal.App.4th 1220, 1229; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426; *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1326 (*Victoria M.*) [under Civ. Code, former § 232].)

C. *Because of Significant Delays in Providing Reunification Services to Mother, We Find Insufficient Evidence Supporting the Finding that Reasonable Reunification Services Were Offered*

1. *The Agency's Responsibilities and Efforts*

*In re K.C.* (2012) 212 Cal.App.4th 323 "sets out the basic standard an agency must meet when providing reunification services to any parent. It must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be ' " 'specifically tailored to fit the circumstances of each family' " ' and ' " 'designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.' " ' " (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420.) Under this standard, the Agency was required to develop and implement a family reunification plan " ' "appropriate for each family . . . based on the unique facts relating to that family." ' " (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 254.) The " 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding that reasonable services were offered or provided, 'the record should show that the supervising agency

identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426, italics omitted (*Tracy J.*).)

The Agency was not authorized to withhold services simply because Mother had been afforded services in a prior dependency. (*Rosa S. v. Superior Court* (2002) 100 Cal.App.4th 1181, 1188–1189.) The prior dependency was successful in that Mother reunified with the children, although she received family maintenance services thereafter. Services may be bypassed in specified circumstances, including a prior dependency which resulted in return of the children to the parent, but only where the removal in each instance was due to physical or sexual abuse. (§361.5, subd. (b)(3).) The Agency did not seek to bypass services for Mother on that or any other ground. "Where jurisdiction has been terminated . . . the parent-child relationship is restored to its former status, free from governmental interference absent extraordinary circumstances, and a new dependency proceeding must include all the statutory provisions designed to protect that relationship." (*Rosa S.*, at p. 1189.) A social worker's doubt about the outcome of services does not excuse a failure to deliver such services, nor does it justify complacency in providing services. (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 429 [" '[A] forecast of failure could not provide an excuse for refusing to try.' "].) There is no such thing as "reunification lite."

Mother contends the Agency failed to provide her with the particular services she required, given her mental deficits and cognitive delays. (See, e.g., *Victoria M.*, *supra*, 207 Cal.App.3d at pp. 1326–1330, 1333 [termination of parental rights for intellectually disabled mother reversed where she had not been provided with services specific to her disabilities].) Indeed, when a parent has a mental illness or disability, that condition must be the "starting point" for a family reunification plan, "not its conclusion." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [disposition order removing children from schizophrenic mother reversed based on lack of substantial evidence of detriment to the

11

children if returned to the mother]; see also *Victoria M.*, at p. 1320 ["before the parental rights of a developmentally disabled parent can be properly terminated the record must establish by clear and convincing evidence that services specially designed to meet the needs of the developmentally disabled have been explored"].)

Here, the Agency insists it did recognize Mother's specific needs and identified services tailored to those needs: GGRC, AFW for in-home counseling and parenting support, in-home support services, individual therapy, potential anger management services, housing, and family therapeutic visitation. GGRC provided services to those with developmental disabilities like Mother's. AFW was a program through GGRC for parents with intellectual disabilities raising children that would provide in-home counseling and parenting services, including sessions about life transitions, anxiety, depression, grief, relationship issues, anger, and stress, as well as in-house parenting support. Brilliant Corners provided housing assistance for developmentally disabled individuals, as well as in-home support services which could offer Mother help in acquiring the practical skills needed to live independently: cleaning, laundry, shopping, cooking, washing dishes, bathing, grooming, dressing, feeding, and getting transportation to and from appointments.[4] Thus, to the extent Mother criticizes the nature and breadth of services proposed and contained in her case plan, we cannot agree.

Our concern about the Agency's provision of services lies not in the failure to identify programs and services tailored to Mother's needs, but in the delays that occurred throughout the dependency in actually getting Mother engaged in the identified services. (See *In re T.W.-1* (2017) 9 Cal.App.5th 339, 346–349 [delay in formulating reunification plan]; *Alvin R.*, *supra*, 108 Cal.App.4th at pp. 965–966, 971–973; Seiser & Kumli,

---

[4] There is some conflict in the record about the nature of services provided by Brilliant Corners. The status review reports indicate it provided housing services, whereas the social worker testified it provided in-home services to "help [M]other . . . manage a schedule and to . . . cook and clean and whatever it is . . . that she needs within the home to take care of her day-to-day needs." We infer Brilliant Corners provided both types of services.

12

*California Juvenile Courts Practice and Procedure* (2017) § 2.152[4][b] "Practice Tip," p. 2-539 [suggesting delays in providing services may be grounds for a finding of no reasonable services] (Seiser & Kumli).) Maintaining Mother on a waiting list was not equivalent to "providing" or "offering" services.

Time is always of the essence in dependency proceedings, especially when children younger than three are involved. (See *In re Kristin W., supra,* 222 Cal.App.3d at pp. 254–256 [parent whose home was unsanitary granted six additional months of services where he was not offered "immediate and intensive support services"].) Parents in the dependency system are subject to a tight timeframe in achieving sometimes seemingly insurmountable goals for progress in parenting their children. Attempting to accommodate the competing needs of the children for permanency and the parents for help in overcoming their parenting deficiencies, the Legislature has set chronological markers for how long is too long to allow parents to show progress. In this case, the initial marker was set at only six months because Mother's youngest son was just two years old at removal.[5] (§ 361.5, subds. (a)(1)(B) & (C).) Yet, at the six-month mark, Mother had been provided with no actual services except therapeutic family visitation, a referral to GGRC, an ineffectual referral to OMI Family Clinic (OMI), and a very recent referral to a private therapist, whom Mother refused to see because her office was in a dangerous neighborhood.

2. *GGRC*

Mother reactivated her services at GGRC in November 2016, but she was considered a difficult client. At her request, her first case worker was replaced by a second in January 2017, but when Mother asked for a third case worker in July 2017, her

---

[5] Mother was not strictly limited to six months of services, however. Section 361.5, subdivision (a)(1)(C) allows a sibling group including a child younger than three to be restricted to six months of reunification services under section 361.5, subdivision (a)(1)(B), but it uses the permissive "may" not the mandatory "must" or "shall." In light of the juvenile court's order at the six-month review, therefore, Mother was eventually allowed 12 months of services.

request was denied. She then stopped communicating with her second case worker. Mother was eventually successful in obtaining a third ongoing case worker in October 2017. Whether and to what extent Mother benefited from this relationship is not known, as her services were terminated in November 2017.

There can be no doubt that regional centers provide valuable services for developmentally disabled individuals. (*Victoria M*., *supra*, 207 Cal.App.3d at pp. 1329–1330.) In fact, *Victoria M.* held it was unreasonable to terminate a developmentally disabled mother's parental rights without first assessing whether the regional center could help her reunify with her child. (207 Cal.App.3d at p. 1331.) But that does not mean that referring such a parent to the regional center is a panacea that automatically satisfies the reasonable services requirement. In this case, the record suggests an overreliance on GGRC to address all of Mother's needs, even though it was clear that relying on GGRC alone would result in significant delays in providing services. When the regional center is so backed up that it cannot help a parent within a reasonable time, the Agency should pursue other possible avenues for obtaining needed services promptly on the parent's behalf. (Cf. *Alvin R.*, *supra*, 108 Cal.App.4th at p. 973 [reasonable services not provided where "the Department's only effort to overcome [the custodial grandmother's scheduling problem] was apparently to make a referral to a therapist who had no time available to see Alvin. There was no evidence that the Department made an effort to find other therapists in the area, or that the Department attempted to find transportation for Alvin to see an available therapist further away."].)

Exactly what services were provided to Mother by GGRC is hard to discern from the record. It appears GGRC may have had psychologists on staff to see clients, but otherwise GGRC appears to have operated as a referral center that arranged and coordinated services for developmentally disabled clients, while the services were actually performed by other providers. (See *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 487–490 [describing role of regional centers].) In considering whether the referral to GGRC constituted the provision of "reasonable" services, we must therefore look at the components of the services it offered.

14

### 3. *Individual Therapy*

Mother complains there was a significant delay in providing her with individual therapy. (See *Alvin R.*, *supra*, 108 Cal.App.4th at p. 973.) Moreover, the Agency appears to have tied together individual therapy with the referral for anger management services, with no anger management services offered unless pre-approved by Mother's therapist.

In November 2016, GGRC placed Mother on a waiting list to see a therapist, Dr. Chad LeJeune. In the interim, the Agency referred Mother through Foster Care Mental Health to OMI to obtain individual therapy. Mother tried to go to OMI but was turned down because her symptoms were not sufficiently acute to meet OMI's criteria. On March 20, 2017, as the six-month hearing drew near, the Agency referred Mother to an individual therapist, whom she refused to see because she felt unsafe in the therapist's neighborhood.[6] Because individual therapy had not begun, she had not been assessed for nor given services for anger management.

In the second six months of her reunification period, Mother found a therapist on her own initiative at Bayview Integrated Behavioral Health on June 5, 2017. She stayed on the waiting list for Dr. LeJeune until July 18, 2017, when she began therapy with him.

Thus, from September 2016 until July 2017, Mother was provided with no individual therapy through GGRC. It may be true, as the Agency suggests, that Mother was to some extent responsible for the delay.[7] But Mother was not altogether resistant to engaging in therapy, as she tried to follow up with the Agency's referral to OMI, which was an inappropriate referral. Even faulting Mother for her refusal of services in March

---

[6] Whether her fear was rational, whether it was related to a mental health issue or her developmental disability, or whether it was feigned because Mother did not want to engage in therapy is impossible to tell from this record. The Agency appears to have treated it as the third of these alternatives.

[7] According to the Agency, it was Mother's decision to be placed on a waiting list for Dr. LeJeune. Mother said she wanted to see a therapist who understood her disability. The record does not show whether a different GGRC therapist would have been available sooner.

2017, that accounts for only 10 weeks of a much longer delay. By the time of the November hearing, Mother had been provided with at most four months of individual therapy during 15 months since her sons had been physically removed from her custody. She had engaged in only two therapy sessions with Dr. LeJeune when the Agency recommended termination of services.

We cannot conclude this was a meaningful provision of therapeutic services. It was Mother's mental health and intellectual disability that brought her family into the dependency system. Providing Mother with individual therapy was of paramount necessity for reunification, and in fact went to the heart of the reason for removal of the children in the first instance. By placing her on a six- to 12-month waiting list for individual therapy, and then waiting four more months before making an alternate appropriate referral, the Agency failed to address with timely services the root of the problem. (Cf. *Patricia W. v. Superior Court, supra,* 244 Cal.App.4th at pp. 403, 420–427 [schizophrenic mother who went off her medication, causing her to have violent hallucinations about killing her two-and-a-half-year-old child, was not provided reasonable services where the agency made no effort to have her properly diagnosed and to resolve her medication needs].) The services provided must not only be appropriately tailored. They must also be accessible.

### 4. *Anger Management*

Because Mother had not been professionally evaluated for the need for anger management services, she never received those services, either. The Agency sat on its hands waiting for a psychologist to bless the referral to anger management services, while simultaneously keeping Mother on a waiting list for individual therapy. This put Mother into something of a catch-22 situation. It seems to us Mother could have been referred for anger management services even without a new psychologist's recommendation, based on Dr. Watt's identification of her "serious anger issues" in the prior dependency and her recommendation that "skills to manage [Mother's] anger would be very helpful." Combined with incidents in the current dependency that confirmed the need, there was sufficient reason to have referred Mother for anger management services without waiting

for another psychologist's recommendation, especially when there proved to be a significant delay in getting Mother connected with a psychologist. There is no substantial evidence the Agency made any effort to assist Mother in this regard. We take this particularly seriously because Mother's "anger issues" had been specified in the section 300, subdivision (b) allegation sustained against her as one of the reasons for the children's dependency, and work on anger management had been built into her case plan.

### 5. *Family Therapy: IPP and Clinically Supervised Visitation*

Though Mother failed to cooperate with family therapy in the prior dependency, she appears to have been in full compliance with the family therapy component of her case plan during the current dependency. In the status review report prepared for the 12-month hearing, the Agency acknowledged Mother continued to fulfill the family therapy component. This was the one area in which the Agency's efforts cannot be faulted.

### 6. *AFW: In-Home Counseling and Parenting Support*

Mother was waitlisted for AFW in November 2016, with a six- to 12-month anticipated wait. She was not actually connected up with AFW until mid-April 2017, nearly eight months after the children were taken from her. The Agency indicates she initially declined those services. The record suggests, though, that Mother met with one AFW worker in April or May, who completed an assessment. Another case worker, Ms. Alvarez, was assigned to work with Mother on a one-to-one ongoing basis beginning in June 2017. Mother resisted that case worker, and did not want her to supervise a visit with the boys. The Agency set one up anyway. At the visit in late June 2017, Mother refused to work with and threatened the AFW worker and said she would call the police after the visit. [8] Due to Mother's attitude and behavior, as well as AFW's short-staffing, AFW terminated services a few days after that visit. No alternative services were arranged.

---

[8] According to the 12-month status review report, Mother said she would allow Ms. Alvarez to attend the visitation, but "threatened Ms. Alvarez and reported she would be calling the police on her after the visit." No other details were provided.

The Agency claims Mother's refusal to participate with AFW once services became available prevented completion of those services. For this position it cites cases saying that parents cannot be forced to engage in reunification services (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220) and that a social worker need not "take the parent by the hand and escort him or her to and through classes or counseling sessions." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) It does appear Mother initially resisted AFW's parenting services but relented and worked with AFW, albeit diffidently, for a brief period from April to June 2017. During that period, she had a number of difficult interactions with AFW personnel, including one in which she said the social worker who performed the assessment, Ms. Murcia,[9] referred to her as "mentally retarded."[10] Then, in late June, a meeting between Mother and her one-to-one social worker, Ms. Alvarez, ended badly, with Mother losing her temper. At that point, AFW refused to provide any further services to Mother, with the net effect that she had

_____

[9] Mother testified that Ms. Murcia "was very disrespectful . . . . And I just sat back and let her be disrespectful for awhile. And then after that, I just couldn't tolerate it, so I just went to her supervisor and told her supervisor about her."

[10] The term "mentally retarded" is an epithet. (See Rosa's Law, Pub. L. No. 111-256 (Oct. 5, 2010) 124 Stat. 2643 [updating and replacing references in federal statutes from "mental retardation" to "intellectual disability" and "mentally retarded individual" to "an individual with an intellectual disability"].) The Senate Report accompanying Senate Bill Number 2781, the bill that was signed into law as Rosa's Law, explains that "the terms 'mentally retarded,' 'mental retardation,' and variations of these terms, to describe individuals with intellectual disabilities are anachronistic, needlessly insensitive and stigmatizing, and clinically outdated. . . . [¶] 'Imbecile,' 'moron,' 'idiot,' and 'feeble-minded' are all terms which have been used to reference people with cognitive disabilities by the public and in our Federal statutes. . . . Within the past 30 years, the terms 'mental retardation' and 'mentally retarded,' or derivatives of those terms, have also developed into colloquial slurs and pejorative phrases used to demean and insult both persons with and without disabilities." (Sen.Rep. No. 111-244, 2d. Sess., p. 2 (2010) [111 S. Rpt. 244].) The American Psychiatric Association also abandoned the term "mental retardation" in its DSM-5, substituting the terms "intellectual disability" or "intellectual developmental disorder." (See <https://www.psychiatry.org/psychiatrists/practice/dsm/educational-resources/dsm-5-fact-sheets> [as of Mar. 29, 2018].)

received a preliminary assessment but no substantial in-home services or parental support services.

The record shows no effort by the Agency to get Mother engaged with similar services elsewhere after June 2017, despite Mother's request for someone else. Notably, Mother never refused to receive services outright or ignored any referrals. She was unquestionably difficult to work with, but the reason why seems clear. As the Agency reported, early on, at the six-month mark, "[w]hen working with mother, there is some denial and defensiveness . . . . *This could clearly be due to her intellectual disability*; an inability to fully comprehend and understand what is being requested and why these services could benefit her and the children." Nothing had changed in the Agency's assessment of Mother at 12 months, except by that time the Agency had ceased to try to find help for her. Under the circumstances, responsibility for Mother's receiving nothing more than a preliminary assessment for in-home counseling and parenting support services must rest at the Agency's doorstep. Mother's problem was not a lack of willingness to receive help. It was that the difficulties caused by her recognized disability—the very difficulties targeted by the individual therapy and anger management components of her case-plan—were never addressed.

7. *Independent Living Skills: Brilliant Corners*

As of the 12-month review, Mother had "not started" receiving in-home supportive services, which meant she had not received mentoring in the everyday practical skills she needed to keep her home clean and safe for her children. This failure occurred despite the fact that such services were essential, given the reasons the boys were taken from her. It appears Brilliant Corners, discussed below, was identified as the likely provider of such services, and she remained on the Brilliant Corners waiting list for almost a year.

The Agency responds that in-home support services could not have begun in any event because Mother would not allow anyone into her temporary living quarters and requested to have social workers meet her outside. It is sheer speculation whether Mother's reticence about having visitors into her temporary quarters was borne of

19

embarrassment, which is one plausible interpretation of the record; paranoid fear, another plausible reading; or, more adversely to her interests, a willful effort to hide squalid conditions she knew were hazardous to her children. The record is not clear enough on the point to support an inference about her desire to meet outside, one way or the other. Certainly, there is not enough to support a finding that she was so implacably resistant to in-home visitors that it relieved the Agency of any obligation to follow through with the independent living skills component of her case plan.

  8. *Housing*: *Brilliant Corners*

  One of the orders at disposition required Mother to "secure housing and maintain the physical conditions of the home clean and organized." Mother's failure to comply with this requirement by providing her children with a safe and sanitary home was a primary reason the children were taken from her custody. Yet the Agency offered no assistance to her in finding suitable housing or helping her learn basic independent living skills, beyond a referral to GGRC.

  In November 2016, GGRC placed her on a waiting list for Brilliant Corners, a service providing housing assistance to people with developmental disabilities, with a projected waiting time of six to 12 months. In late January 2017, the Agency was told it would be another four to eight months before services could begin. Mother remained on a waiting list through GGRC for Brilliant Corners at the six-month review and the 12-month status review report. The record shows Mother was never provided housing assistance or mentoring on everyday life skills by Brilliant Corners or anyone else.

  The housing authority kept pushing back the completion date for repairs on her apartment, complicating the picture for reasons beyond Mother's control. It is not surprising that she bounced from one temporary living situation to another during this time or that her temporary quarters may not have been well-suited for children, given the impacted housing market in San Francisco, her intellectual disability, and her limited means. (See *Victoria M.*, *supra*, 207 Cal.App.3d at pp. 1327–1328 [services offered to mildly intellectually disabled mother were not reasonable in part because they did not address her housing needs, even though housing inadequacy had led to the dependency].)

The Agency deserves no credit for the Brilliant Corners referral, since no services ever materialized.

9. *Conclusion: No Substantial Evidence Supports the Reasonable Services Finding, and a Hearing Under Section 366.26 Should Not Have Been Set*

In summary, the Agency put Mother in a holding pattern that resulted in a wait of nearly 11 months after her children were removed from her physical custody before she was provided with an individual therapist; it failed completely to provide her with help for anger management; it delayed almost eight months from physical removal in providing services from AFW and never delivered ongoing services; it failed to give her help with practical independent living skills; and it failed to provide her with housing assistance. Under the circumstances, we see no substantial evidence—certainly not enough to persuade a reasonable factfinder by clear and convincing proof—that reasonable services were offered or provided by the Agency. Hence, we must conclude the court abused its discretion in terminating services and setting a hearing under section 366.26. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1166.)

The Agency insists "the standard is not whether the services provided were the best that might be provided in an ideal world" (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*)), but that commonplace notion obscures the real issue here, which is whether the limited steps it took were adequate to meet this family's particular needs. While, obviously, services need not meet the unattainable goal of perfection, "they must be designed to remedy the family's problems and accommodate the special needs of disabled parents." (*Tracy J., supra,* 202 Cal.App.4th at p. 1427.) In *In re Daniel G.* (1994) 25 Cal.App.4th 1205 (*Daniel G.*), the minor was born to a mother under a conservatorship and institutionalized with an intellectual disability, schizophrenia, and poor impulse control, yet the mother was still entitled to reunification services and had termination of her parental rights reversed where the services provided were inadequate. (*Id.* at pp. 1207–1208, 1210–1217.) Although we would not go so far as to call the Agency's efforts " 'a disgrace,' " as did the trial court there (*id*. at p. 1209), we have no trouble concluding that, to sustain a reasonable services finding in this case—to the level

21

of certainty required by the clear and convincing proof standard—we would need to see more than we have on this record.

We reach this conclusion independently of the question whether Mother is likely to show herself capable of resuming custody of her sons in the near future. Our focus is strictly on the reasonable services issue. The Agency's viewpoint on the likelihood of return of the children, ultimately, may remain unchanged. We point out, however, that Mother's original public housing apartment may have been renovated by now, which would help to alleviate some of the problems that led to the children's dependency. In addition, the eldest son is now capable of administering his own medications, which would further mitigate the problems that required the boys' removal. It remains to be seen whether Mother will successfully reunify with her sons, but she deserves a chance to try, with full provision of reunification services while making the effort.

The Agency emphasizes that throughout the reunification period, indeed throughout its entire experience with her, going back to her family's prior dependency, there was a consistent and longstanding refusal to cooperate on Mother's part.[11] True, as we have noted with respect to individual case-plan components, her compliance with the plan was reluctant in some respects and recalcitrant in others. But although Mother's pugnacious personality made her problematic to deal with, she did cooperate with

---

[11] *In re Christina L.* (1992) 3 Cal.App.4th 404, 410–411, 418 and *Misako R.*, *supra,* 2 Cal.App.4th at pages 543, 544–545, found reasonable services had been provided to intellectually disabled parents where there was a clear refusal of participation in regional center services. Both cases are distinguishable because Mother in our case was not "wholly uncooperative" with GGRC (*Misako R.*, at p. 543); to the contrary, by her conduct in attempting to seek out her own therapist she demonstrated a willingness to receive required therapy and an understanding it was needed. *Christina L.* and *Misako R.* involved outright refusals to engage in services. Moreover, in *Christina L.*, the time the child had been in foster care was much longer, the child had been moved from foster home to foster home, and perhaps most telling, mother-child visitation had been extremely difficult, with the child ultimately refusing to see her mother. (*Christina L.,* at pp. 408–409, 411.) *Misako R.* involved physical abuse by the mother's boyfriend and also involved a mother whose parental rights were not subject to termination, and hence the standard of proof was a preponderance of the evidence. (*Misako R.,* at pp. 547–548.)

22

services in several important ways: she consistently complied with visitation and learned to cooperate with the visitation supervisor, she attempted to follow up on the referral to OMI and was denied services through no fault of her own, she obtained individual therapy through her own self-referral even before the Agency provided her with therapeutic services, she started therapy with Dr. LeJeune as soon as he became available, she vacated her public housing to allow repairs to be made, found other shelter, and engaged with GGRC and AFW to some extent (though she was a demanding client). Clearly, she was trying.

As difficult a person as Mother has shown herself to be, it is important to bear in mind what this case does not involve: There are no allegations here that Mother suffers from drug or alcohol dependence, or is engaging in criminality, or is a victim of in-home domestic violence, or is committing physical abuse or emotional abuse of the children. Rather, what we have here is a neglect case involving an intellectually disabled parent with some accompanying mental illness, struggling to raise her children in conditions of abject poverty. It is telling, in our view, that Mother was penalized heavily for failing to provide secure, cleanly and well-kept housing for her family, a common problem for many in San Francisco, yet she was given no assistance with the special challenges of doing so as a developmentally disabled person. We do not question the earnestness of the social worker's skepticism that Mother will ever be capable of reunifying—a view expressed at the outset of these proceedings, before reunification even began—but it does appear to us that the Agency allowed this attitude to become a self-fulfilling prophecy, thus draining its efforts of vigor based on a " 'forecast of failure.' " (*Patricia W. v. Superior Court, supra,* 244 Cal.App.4th at p. 429.)

A mentally disabled parent may be bypassed for reunification services altogether only if he or she is determined, by clear and convincing evidence, to be "incapable of utilizing those services." (§ 361.5, subd. (b)(2); *San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 220, fn. 2 (*San Joaquin*).) But bypass on that basis requires evidence from two qualified experts in psychiatry or psychology that "even with the provision of services, the parent is unlikely to be capable of adequately

23

caring for the child within the time limits specified in subdivision (a)." (§ 361.5, subd. (c)(1); Fam. Code, § 7827; *In re Rebecca H.* (1991) 227 Cal.App.3d 825, 830.) The Agency made no effort to have a section 361.5, subdivision (b)(2) bypass determination made here, and it cannot circumvent this stringent standard by simply going through the motions of providing services and waiting for an inevitable failure. Absent a statutory reason for bypass, "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a).) "The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.) A half-hearted effort on the Agency's part—which leaves the parent without services for months on end—does not amount to the provision of reasonable services. (See *Alvin R.*, *supra*, 108 Cal.App.4th at pp. 971–974.)

> D. *The Remedy is to Award Mother More Services up to 24 Months from Removal of the Children from Mother's Physical Custody*

We next confront the question of remedy because the children have now been out of Mother's custody for more than 18 months. Going strictly by the calendar, the 18-month mark fell on February 22, 2018. What happens in a case, like this one, where the 12-month review hearing was not completed until 15 months after physical removal, and due to the time necessary for review—even as expedited in writ proceedings—the determination that reasonable services were not provided comes at a point beyond 18 months after removal? In these circumstances, are we empowered to direct that an extended period of services be provided on remand, so long as the extended period does not run beyond 24 months? We conclude we are.

Ordinarily reunification services are available to parents for a maximum of 18 months from the physical removal of the children from their home. (§ 361.5, subd. (a)(3)(A).) Justice Goodwin Liu of the Supreme Court recently noted a split of authority on whether a section 366.26 hearing must be scheduled, or whether additional reunification services may be provided, when the issue arises after the 18-month mark

24

has been reached: "How should a juvenile court proceed when 18 months have elapsed since the child has been removed from parental custody but reasonable reunification services have not been provided?" (*J.C. v. Superior Court* (Aug. 23, 2017, S243357) Statement Respecting Denial Of Review By Liu, J. (*J.C.*) [2017 Cal. Lexis 6576, at p. *11].) Justice Liu considered specifically a decision made at an 18-month review, but his remarks suggest the question arises whenever services are ordered beyond the 18-month mark. (*Id.* at p. *4.)[12]

Justice Liu's Statement in *J.C.* raises the question whether courts have the authority to order reunification services after 18 months have elapsed, given the statutory language: "Section 361.5, subdivision (a)(3)(A) provides that services can be extended 'up to a maximum time period not to exceed 18 months after the date the child was originally removed' from parental custody. But if the court cannot order a section 366.26 hearing until reasonable services have been received, and if 18 months have already elapsed, then presumably it would be necessary for the court to order services beyond the 18-month deadline so that the child dependency proceedings can move forward." (*J.C.*, *supra,* 2017 Cal. Lexis 6576, at p. *9.) Indeed, even at an 18-month review, the court is

---

[12] Justice Liu cited *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490 (*Earl L.*), in which the court found reasonable services had not been provided in the 12- to 18-month period, but reasonable services had been provided previously, over the history of the dependency. (*Id.* at pp. 1500, 1502–1503.) In that case, decided on appeal by a panel of the Fourth District, Division Three, the juvenile court did not extend services beyond the 18-month hearing because the incarcerated father had made no effort to engage in services during the period under review and had no chance of reunifying within the extended period because he would remain incarcerated throughout. (*Id.* at pp. 1505–1506.) The Court of Appeal affirmed, holding a finding of reasonable services at the 18-month review is not a prerequisite to setting a hearing under section 366.26. (*Id.* at pp. 1504–1507.) A panel in this Division, here in the First District, recently cited and applied *Earl L.* in *N.M. v. Superior Court* (2016) 5 Cal.App.5th 796 (*N.M.*). The key factor distinguishing *Earl L.* and *N.M.* from this case is that Mother's services were terminated at the 12-month hearing, when a finding by clear and convincing evidence that reasonable services have been offered or provided *was* a prerequisite to setting a hearing under section 366.26. (§ 366.21, subd. (g)(1)(C)(ii).)

authorized to provide six more months of services if reasonable services have not been offered or provided (§ 366.22, subd. (b)), and section 366.22, subdivision (b)(3)(C) provides that a hearing under section 366.26 shall not be scheduled "unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian."[13]  It is not clear if this provision applies more broadly than to the three categories of parents discussed in that subdivision, but Justice Liu noted "it is unclear why the Legislature would have chosen to provide such protection only to this subset of parents and guardians." (*J.C.*, *supra*, 2017 Cal. Lexis 6576, at p. *8.)  Indeed, Justice Liu identified a split of authority whether services may be provided beyond 18 months for parents other than recently incarcerated or minor parents or parents in a residential substance abuse rehabilitation program. (*J.C.*, *supra*, 2017 Cal. Lexis 6576, at pp. *4-5, *9-10.)

Justice Liu considered the questions he posed to lie "at the crosshairs of competing policy objectives," namely the goal of "family preservation and protect[ing] parental rights" on the one hand, and the " 'child's need for stability and security within a definitive time frame' " on the other. (*J.C.*, *supra*, 2017 Cal. Lexis 6576, at p. *10.) Justice Liu drew no conclusion as to how that tension in competing policies should be resolved, expressing the view the Legislature should address the issue, since the resolution of the question depends on "careful examination of the adequacy of reunification services throughout California's diverse counties and the likelihood of achieving reunification within particular time frames," subjects more readily explored by

---

[13] Section 366.22, subdivision (b) specifically allows services to be extended to the 24-month mark for "a parent or legal guardian who is making significant and consistent progress in a court-ordered residential substance abuse treatment program, a parent who was either a minor parent or a nonminor dependent parent at the time of the initial hearing making significant and consistent progress in establishing a safe home for the child's return, or a parent recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security and making significant and consistent progress in establishing a safe home for the child's return."

the Legislature. (*Id.* at p. *11.) He also suggested legislative action was necessary due to a "lack of clarity" in the current statutory scheme. (*Id.* at p. *1.)

A First District, Division Three, panel addressed this lack of clarity in *In re J.E.* (2016) 3 Cal.App.5th 557 (*J.E.*), where a county agency appealed after the juvenile court extended services for six additional months at the 18-month review hearing because the services rendered had not included an assessment for sex offender treatment for the minor, which the trial court viewed as the " 'core issue' " standing in the way of reunification. (*Id.* at p. 562.) The agency in the *J.E.* case, citing the Third District's opinion in *San Joaquin*, *supra*, 227 Cal.App.4th at pages 223–224, argued services could not be extended beyond 18 months except in the three circumstances spelled out in section 366.22, subdivision (b), as amended effective January 1, 2009. (See fn. 13, *ante*.)[14] As *J.E.* pointed out, the statement to this effect in *San Joaquin* was dicta because, having concluded there was no substantial evidence to support the trial court's finding of a failure to offer or provide reasonable services in that case, it was unnecessary to decide whether a further period of services was warranted. (*J.E.*, at pp. 565–566.)

Because that issue was squarely presented in *J.E.*, however, the Division Three panel concluded the juvenile court had pre-existing authority to order further services beyond 18 months under section 352, which grants the courts discretion to "continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor." (§ 352; see *J.E.*, *supra*, 3 Cal.App.5th at p. 564.) At least two cases, *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016 and *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1795–1796 (*Elizabeth R.*), had already so interpreted the

---

[14] Although *San Joaquin* involved what was classified as a 12-month review hearing, because the proceeding at issue there took place 20 months after the minor's detention, it was treated as an 18-month permanency review hearing subject to section 366.22, subdivision (b). (*San Joaquin*, *supra*, 227 Cal.App.4th at pp. 222–223 & fn. 5.) The opinion does not cite *Earl L.*, but its application of section 366.22, subdivision (b), in substance, adopts the same approach used in *Earl L.*

27

statutes before the relevant changes to section 366.22, subdivision (b) were enacted, effective January 1, 2009.  (*J.E.*, *supra*, 3 Cal.App.5th at p. 564; Stats. 2008, ch. 482, § 3.)  Indeed, the Legislative Counsel's Digest indicates the amendment was intended to "provide *additional* circumstances in which court-ordered services may be extended," implicitly recognizing that other circumstances already justified such an extension.  (Legis. Counsel's Dig., Assem. Bill No. 2070 (2007–2008 Reg. Sess.) Stats. 2008, Summary Dig., p. 202, italics added.)  *J.E.* concluded the 2009 amendment did not restrict that pre-existing discretion:  "[T]he new provision did not limit the court's discretion to extend services based on a finding that reasonable reunification services were not provided."  (*J.E.,* at p. 565.)

We agree with the analysis in *J.E.*, but in addition to the general authority to continue hearings in dependency proceedings provided by section 352, we think the statutory scheme governing the timeline for reunification services specifically authorizes extended services beyond 18 months in the circumstances we have here.  That scheme begins with a presumptive minimum services period of either six months for children under age three or 12 months for children age three and older;[15] it then permits

---

[15] Section 361.5, subdivision (a)(1)(A)–(C); section 366.21, subdivision (g).  In 2009, the Legislature enacted a set of amendments to section 361.5 and section 388 that effected a "major policy shift" away from the view that these timelines were maximums. (Seiser & Kumli, *supra*, § 2.129[1], at p. 2-455.)  "The Assembly Committee on Human Services report [for this legislation] explained the author's intent was to afford parents 'a *minimum* (emphasis added) of 6 months of reunification services for children under three and 12 months of reunification services for children over the age of three.'  (Assem. Com. on Human Services, Analysis of Assem. Bill No. 2341 (2007–2008 Reg. Sess.) as amended Mar. 28, 2008, p. 2 [italics and parenthetical in original].) . . . [¶] The report stated that, '[a]s amended, this bill would continue to allow courts to change, modify or set aside initial orders for reunification services, but would narrow the instances in which the court could use this discretion to those in which changed circumstances or new evidence, if available at the time of the disposition hearing, could have led the court to bypass reunification services.'  (Assem. Com. on Human Services, Analysis of Assem. Bill No. 2341 (2007–2008 Reg. Sess.) as amended Mar. 28, 2008, p. 4.)"  (*M.C. v. Superior Court* (2016) 3 Cal.App.5th 838, 846–847.)

continuances beyond the permanency hearing with extended periods of services in narrowly defined circumstances, first, up to an additional six months[16] where the permanent plan calls for returning the child to parental custody[17] and there is a substantial probability of return within the "extended time period";[18] and, second, up to another six months[19] where there is a substantial probability of return by 24 months and it is in the "best interests of the child" to order the extension.[20] Stated in somewhat more simplified terms, there is the possibility of optional, extended periods of services beyond the six or 12 month minimums after the required period for services has elapsed, but only where the permanent plan is to return the child to parental custody and enough progress toward reunification has been shown to warrant a finding of substantial probability of return, with an additional "best interests of the child" finding required for the second extension. Notably, however, for each of the extended six-month periods, the governing statutes use disjunctive phrasing suggesting that a past failure to provide reasonable services for the requisite minimum period—by itself—will justify granting an extension.[21] This aspect of

---

[16] Section 361.5, subdivision (a)(3)(A); section 366.21. subdivisions (e)(3) and (g)(1).

[17] Section 361.5, subdivision (a)(3)(A).

[18] Section 361.5, subdivisions (a)(3)(A), (a)(4)(A); section 366.21, subdivision (g)(1). See also section 366.21, subdivision (e)(3) (within six months).

[19] Section 361.5, subdivision (a)(4)(A).

[20] Section 366.22, subdivision (b).

[21] See section 361.5, subdivision (a)(3)(A) ("*The court shall extend the time period only if it finds that* there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period *or that reasonable services have not been provided* to the parent or guardian." (Italics added.)); section 366.21, subdivision (e)(3) (similar); section 366.21, subdivision (g)(1) (similar); section 361.5, subdivision (a)(4)(A) ("*The court shall extend the time period only if it finds that* it is in the child's best interest to have the time period extended and that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian who is described in subdivision (b) of Section 366.22 within the

the statutory language did not come up in *Earl L.*, *N.M.*, or *San Joaquin*, presumably because the issue in those cases was not whether the requisite minimum period of services had been offered or provided. Rather, the parents there sought optional, additional periods of services, and raised the issue belatedly, in the final stages of reunification review.

Nor did the opinions in *Earl L.*, *N.M.*, or *San Joaquin* consider the statutory scheme as a whole. Section 361.5, subdivisions (a)(3)(A) and (a)(4)(A) both begin with a sentence indicating the permanent plan must be for return of the child to the parent in order for services to be extended. We read this sentence as presupposing that the presumptive minimum period of reasonable services has been offered or provided up to that point in time. Without this presupposition, the second sentence of each subdivision becomes ambiguous and self-contradictory insofar as it authorizes extension of services based on the failure to provide reasonable services to the parent. The permanent plan will virtually never be to return the child to the parent in a situation where the Agency is seeking to terminate reunification services, as is often the case when the issue of extension arises. We also note that section 361.5 is the only one of this interrelated family of statutes (§§ 361.5, subd. (a)(3)(A), 361.5, subd. (a)(4)(A), 366.21 and 366.22) that requires a permanent plan of return home as a prerequisite to extending services and that the more specific statutes among them (§§ 366.21 and 366.22) do not mention the necessity of a permanent plan of return home when describing the circumstances under which services may be extended.

Accordingly, based on the statutory framework when considered as a whole, we conclude that where, as in this case, a timely challenge to the adequacy of services for the statutorily required minimum period—here, 12 months—is sustained, that failure to provide services will justify the extension of services beyond 18 months, even without a showing of best interests of the child or substantial probability of return, and even if the

---

extended time period, *or that reasonable services have not been provided* to the parent or guardian." (Italics added.)); section 366.22, subdivision (b) (similar).

permanent plan is not to return the child to the parent. We reach this conclusion not only because it harmonizes elements of the statutory scheme that are in tension with one another, but because "[w]here reasonable services are not afforded there is a substantial risk the court's finding the child cannot be returned to the parent will be erroneous. [Citation.] To put it another way: in order to meet due process requirements at the termination stage, the court must be satisfied reasonable services have been offered during the reunification stage" (*Daniel G., supra,* 25 Cal.App.4th at pp. 1215–1216) for at least the period specified as the statutory minimum. Although discretionary extensions beyond that minimum period are subject to tightly-defined statutory limitations, as *Earl L.*, *N.M.* and *San Joaquin* all recognize, we are convinced, at least where, as in this case, the error in finding the Agency provided reasonable services was made at the 12-month hearing, an extended period of services must be ordered on review, even if that means services will be offered beyond the 18-month mark specified in section 361.5, subdivision (a)(3)(A).

A contrary analysis, reading the statutory exceptions in Section 366.22, subdivision (b) as the *exclusive* basis for extensions beyond 18 months, and focusing on section 366.22, subdivision (b), in isolation, could leave some parents remediless, even if they successfully challenge the provision of reasonable services during the required 12-month or six-month reunification period on writ review. It could also tend to create an incentive for supervising agencies to avoid their statutory obligation to provide services by simply "waiting things out" through delay. Particularly given the stakes involved, we do not view this as a reasonable reading of the statutory scheme. Nor, in this case, do we believe a continuance of the 12-month review proceedings would be contrary to the children's interests (§ 352), as they are living with MGM, who is willing to adopt. These children appear to be in a familiar and stable environment in which they will remain. Though postponing finality is not a favored outcome, neither is splitting up a family where the sole parent has not been provided the presumptive minimum period specified for reasonable reunification services. And where the parent has special needs, the courts

are more willing to extend services beyond 18 months.  (See *Elizabeth R.*, *supra*, 35 Cal.App.4th at pp. 1793–1796.)

In similar circumstances, *Tracy J.* granted intellectually and physically disabled parents a period of additional reunification services where services were improperly terminated at a combined 12- and 18-month hearing based on an unsupported finding that reasonable services had been provided.  (*Tracy J.*, *supra*, 202 Cal.App.4th at pp. 1419, 1428.)  So long as the extended period does not run beyond 24 months, we hold that the same remedy should be afforded here.  (See also *Daniel G.*, *supra*, 25 Cal.App.4th at pp. 1210–1217 [where reasonable services were not provided during the 12 months preceding the 18-month review, order terminating parental rights was reversed and case remanded for consideration of further services]; *In re Dino E., supra,* 6 Cal.App.4th at pp. 1777–1778 [where no reunification plan had been developed at combined 12- and 18-month review, case was remanded to allow trial court to consider factors relevant to continued reunification efforts].)

## III.  DISPOSITION

The petition is granted.  Let an extraordinary writ issue directing the juvenile court to (1) vacate its finding on November 17, 2017 that reasonable services were offered or provided to Mother; (2) enter a new and different finding that reasonable services were not offered or provided to Mother; (3) vacate its orders terminating reunification services and setting a hearing under section 366.26; (4) set a continued 12-month permanency hearing at the earliest convenient time; (5) order the Agency to provide Mother with an additional period of reunification services, so long as the period of extended services does not run beyond 24 months from removal.  This decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

32

_____

Streeter, J.

We concur:

_____

Ruvolo, P.J.

_____

Schulman, J.[*]

_____

[*] Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A153034/*T.J. v. Superior Court*

33

A153034/*T.J. v. Superior Court*

Trial Court:   San Francisco City & County Superior Court

Trial Judge:   Hon. Paul H. Alvarado

Counsel:

Furst & Pendergast, Margaret A. Pendergast for Petitioner.

No appearance for Respondent.

San Francisco Office of the City Attorney, Dennis J. Herrera, City Attorney, Kimiko Burton, Lead Attorney, Elizabeth McDonald Muniz, Deputy City Attorney for Real Party in Interest.