Filed 3/25/21  G.P.R. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

G.P.R.,

    Petitioner,

v.

THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,

    Respondent;

SAN FRANCISCO HUMAN SERVICES AGENCY, et al.,

    Real Parties in Interest.

</td><td>

A161884

(San Francisco County
Super. Ct. No. JD20-3016)

</td></tr>
</table>

Isaiah W., born in December 2019, with severe drug withdrawal symptoms, was immediately removed from the custody of mother, S.W., age 33, and father, G.P.R., age 42, under Welfare and Institutions Code section 300 et seq.[1]  At the six-month review hearing, the court ordered the termination of both parents' reunification services and set a permanent planning hearing under section 366.22.  Father has filed a petition for an extraordinary writ challenging the court's order.[2]  We conclude the court did not commit any errors complained of and, therefore, deny father's petition.

---

[1]  All statutory references are to the Welfare and Institutions Code.

[2]  After mother filed a notice of intent to file a writ petition, her counsel filed a "no issues" statement pursuant to *In re Sade C.* (1996) 13 Cal.4th 952

1

# BACKGROUND

## I.

### *The Initiation of Dependency Proceedings*

In January 2020, the San Francisco Human Services Agency (Agency) filed its petition alleging that mother had used fentanyl while pregnant with Isaiah, resulting in his being born with life-threatening withdrawal symptoms, and that father had failed to protect Isaiah from mother's drug use during her pregnancy.

The Agency wrote in a detention report that mother said in a phone interview that she had become addicted to fentanyl but stopped using it two months before Isaiah's birth. However, doctors said Isaiah, who was hospitalized in intensive care for 20 days, was unlikely to have experienced his withdrawal symptoms if mother had stopped her use. Father said via an interpreter that he knew mother used drugs and that Isaiah should be in the county's custody. Mother yelled that father's interpreter was wrong and the phone call was ended.

The next day, father told the Agency's social worker that he actually thought Isaiah should be with mother once she was clean and sober. He said he and mother were in a relationship but did not live together. He had encouraged her not to use drugs during her pregnancy. She had bought drugs with money he gave her and had used as recently as a few weeks after Isaiah's birth.

---

(*Sade C.*) and *In re Phoenix H.* (2009) 47 Cal.4th 835. Mother declined the opportunity to file a petition herself. We issued a separate order regarding her matter on March 18, 2021. Here, we discuss mother's circumstances only as they are relevant to father's petition.

The court ordered that Isaiah be detained and placed in foster care. After DNA testing established his paternity, father was designated Isaiah's presumed father.

## II.

### *Jurisdiction and Disposition*

In a March 2020 report for a jurisdiction/disposition hearing, the Agency reported Isaiah was thriving in foster care and mother and father were regularly visiting him in person. Mother again asserted that she had remained sober since quitting drugs late in her pregnancy. She admitted using money father gave her to buy drugs. She said she was willing to be drug-tested and to enter a residential treatment program, but it was unclear if she had been tested and she had not entered a program made available to her.

The Agency reported that father said mother told him about her drug use a week before Isaiah's birth, and he did not know if she used fentanyl or how long she had been sober. When he told her not to use, she " 'would dismiss' " him and not want to talk about it. He gave her money after every "meeting" and was unsure what she did with it.

Father also said he had held electronics store jobs for more than 12 years and rented a bedroom in a single-family home. He did not have the necessary items to care for Isaiah and preferred that Isaiah live with mother. Father was from Guatemala, had eight children there, came to this country in 2005 in search of better employment opportunities and had no mental health or substance abuse issues, or any criminal record.

The Agency was concerned that mother's "current substance abuse will prevent her from making safe decisions for her and her baby, resulting in the newborn being injured or not having his needs met." It recommended the

3

juvenile court order that Isaiah be placed out of the home and that both parents receive reunification services. The Agency further recommended that the court adopt a case plan setting as a safety goal that "[a] safe and sober caregiver who is able to be responsive to his social, emotional, and developmental needs will always care for Isaiah. [Mother] will work with the Agency, her support network, and treatment team to gain insight into her substance use in order to demonstrate capacity to provide safe care for the baby. The father will participate in a parenting class in order to learn new skills." The Agency recommended parenting classes for both parents, substance abuse treatment for mother, supervised visits with Isaiah, and that father be directed to obtain the resources and items to enable him to adequately care for Isaiah and "provide a safe home."

The juvenile court sustained the Agency's allegation that father was unable to protect Isaiah from mother's substance abuse while mother was pregnant and ordered that Isaiah be placed in foster care and that parents receive the recommended reunification services.

### III.

### *The Agency's August 2020 Six-Month Review Report*

In its August 2020 six-month review report, the Agency wrote that Isaiah was happy, thriving and developmentally on target. His parents had been issued iPads to conduct virtual visits during the COVID-19 pandemic. Father visited twice a week, was loving, affectionate and engaging with Isaiah and had purchased some toys for him. Mother reported losing her iPad and shared virtual visits with father. A first-time parent, she sometimes became overwhelmed, cried and "cussed" at father in a playful but inappropriate way.

Mother was in denial about her substance abuse problem and refused to participate in services. She had only tested once and the result was positive for fentanyl. She had not entered two available treatment programs and had left two others within days. Because she was not engaged in substance abuse services, she was not eligible to participate in a parenting course.

Father had successfully completed a fatherhood program and had been referred to a support group. He had lost his job as a result of the pandemic and made some money selling face masks on the street in San Francisco. He was not eligible for public assistance. He continued to live in his rented room, which the Agency's social worker visited unannounced in July 2020. She found it was actually a patio space leading to a yard, was hazardous for an infant, and was in a residence that was cluttered and not altogether hygienic.

The Agency reported that mother and father remained in a relationship and had reported a July 2020 pregnancy scare. Also, "father appears unable to say no to [mother] or her using substances. This behavior, too, p[l]aces the ba[b]y at risk for harm in his care as he appears unable to say no to mother in order to protect Isaiah."

In light of these circumstances, the Agency recommended that the court terminate reunification services for both parents.

**IV.**

***The Agency's December 2020 Addendum Report***

The Agency submitted a December 22, 2020 addendum to its August report for a rescheduled six-month review hearing. It confirmed its previous recommendations.

5

The Agency reported that mother was unable to stay sober. She had been unable to stay in four residential programs. In her last, she continued to use and had angry outbursts at program staff. Once, she left the program without permission to see father, returning two hours later. She was discharged from the program after about a month, in late October 2020, "because of her continued drug use and unwillingness to follow the rules." Also, she was registered for drug testing at a lab, where she had "missed many drug test dates and the few tests she did take came back positive for Fentanyl." She had tested negative three times and positive four times while in her last treatment program, and since leaving the program had tested positive once, negative twice and had missed two tests.

Father continued to visit with Isaiah and showed affection toward him, brought him gifts, and was attentive.

The Agency further reported that the "co-dependent relationship" between mother and father "still exists today" and there appeared to have been "no changes in their relationship. The mother has not stopped abusing Fentanyl and the father is silent. Although the father claims that he does not approve of her lifestyle, he is still a part of it. He does not set healthy boundaries with mother nor has he acquired certain items in order to have the minor in his care."

## V.

### *The January 2021 Six-Month Review Hearing*

The court held a contested six-month review hearing in January 2021. The Agency social worker assigned to the case, Sandra Gomez, testified consistent with the Agency's reports and added additional information and details. Regarding mother, Gomez said six drug tests had been scheduled for

6

her since December 14, 2020. Mother had missed the first three out of four, and the other tests had been normal.

Regarding father, Gomez said she had observed there was not enough space in his rented room for Isaiah to sleep in, no heat, wires coming out of a socket and heavy items on top of the bed. She discussed her concerns about the room with father and changes he needed to make, but he had not made changes. She was also concerned about how he would care for Isaiah without income. She had referred him to a community center that helped people in his circumstances look for work.

Gomez said she was in contact with father at least four times a month. Gomez told father "every time that [mother] . . . was using drugs and was leaving" a treatment program, and talked with him about the problem of his continuing to have a relationship with her while she used drugs; indeed, this was the topic of the majority of their conversations. Gomez told him in May 2020, after mother had left two programs, that it was unlikely Isaiah would be returned to her care and that the Agency was concerned about reunifying Isaiah with him if he remained involved with her. Yet there were times when Gomez called him and he said mother was with him. According to Gomez, "he said, [w]ell, you know, she calls me and I see her."

Father told Gomez in November 2020 that he was no longer in a relationship with mother, but Gomez remained concerned that father would not protect Isaiah from mother. There were indications that the two remained in contact. Mother said she gave father money for rent that the Agency gave her to participate in programs. Mother recently had another pregnancy scare, and Gomez suspected father was involved because mother had left her last program to see him. Gomez said father had learned about

7

boundaries in the fatherhood program, but "he has not learned how to set boundaries."

Gomez also said she told father five months before the hearing to contact Homeless Prenatal for housing assistance, but that father only told her a few weeks ago that he had done so. She said Homeless Prenatal could also help him obtain items such as a crib and a dresser for Isaiah after reunification. Gomez said the case worker from Homeless Prenatal had called her in late November and mid-December but had not reached her, that Gomez had not returned her calls, but that Gomez had spoken to her the morning of her testimony. Gomez testified that the case worker told her Homeless Prenatal was not providing father with any services at the moment because he had completed its parenting class and he was not eligible for housing services, i.e., placement in a family shelter, unless he was reunified with Isaiah.

Gomez was asked by the court if father presently wanted Isaiah placed in his care. She said that since the beginning of the case father had not shown initiative or follow through about such things as making his home safe and learning how to set boundaries with mother, so she did not know how serious he was about caring for Isaiah.

Mother testified that she was no longer in a relationship with father. She had not known until the last time she had come to court (a date she did not specify) that she was not supposed to be in a relationship with him. Since ending the relationship, she only met with him to give him rent money, including when she left her program in October 2020. She said that, if necessary, she would stay away from father if he were reunited with Isaiah. She also said she was in an outpatient substance abuse treatment program and had tested negative in her last four drug tests. She added that Gomez

was not answering her calls, but that she had texted Gomez about the outpatient program and arranged for her negative test results to be sent to Gomez.

Father testified that he was not currently in a relationship with mother nor providing her with financial support. He said he was willing to impose boundaries "as much as I can" on mother's contact with Isaiah. He had last seen her when she left her program in order to give him money. He had recently texted her that Isaiah had a temperature and sent photos of Isaiah to her when he visited.

As for his present circumstances, father said that he was sometimes called for work but did not have a set work schedule. Sometimes he received a call at 4:00 a.m., sometimes at 6:00 a.m. His bedroom was 5 by 10 feet, and he could "try to make it look better, try to make sure there's more space; clean it up better." He did not think, as "a man," that the wires in the room were dangerous.

Father also said he had completed another parenting program, at Homeless Prenatal, in August 2020, and was looking for new housing with that group's help. The Homeless Prenatal case worker was helping him, and she and Gomez had not been able to reach each other yet, though he understood each had called the other without success. He had purchased a bed and some clothes for Isaiah. If the court did not return Isaiah to mother's care, he wanted Isaiah to be placed with him.

The court followed the Agency's recommendations. It found that returning Isaiah to either parent would create a substantial risk of detriment to his safety and well-being. It found by clear and convincing evidence that reasonable services had been made available to both parents, there was no substantial probability of returning Isaiah to either parent by the 12-month

review in March 2021, and that the parents had not demonstrated the capacity and ability to complete the objects of the treatment plan and to provide for Isaiah's safety, protection, and physical and emotional health. The court terminated mother's and father's reunification services and scheduled a permanent planning hearing under section 366.26 for May 2021. Among other things, it emphasized that mother had testified that she had been in a relationship with father until her last appearance in court. In light of mother's testimony, the court found father's testimony to be "a little bit incredible, unbelievable." The court further found that father had made "absolutely no efforts to make his own space safer," had not "demonstrated the boundaries or what needs to be done if his intimate partner is using drugs", and had an irregular work schedule that made Isaiah's care problematic.

Father's timely writ petition followed.

## DISCUSSION

Father challenges the findings supporting the court's termination of his reunification services and setting of a permanent planning hearing under section 366.26. He also challenges the court's finding that reasonable reunification services were made available to him. We review the juvenile court's findings for substantial evidence (see *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688 [findings supporting termination of services]); *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [findings regarding provision of reasonable services].) We "review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R.*, at pp. 688-689.) We affirm the ruling if it is supported by evidence that is reasonable in nature, credible, and of solid value. (*In re Lynna B.* (1979)

10

92 Cal.App.3d 682, 695.) " ' " 'It is neither the duty nor the right of this court to resolve conflicts in the evidence, pass on the credibility of the witnesses, or determine where the preponderance of the evidence lies. These are all matters to be decided by the trier of fact in the court below. The power of any appellate court commences and terminates with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact.' " ' " (*Ibid*.)

## I.

### *The Court's Finding That There Was No Substantial Probability Isaiah Might Be Returned to Father Within the Statutory Deadline Is Supported by Substantial Evidence.*

Father argues that the court's termination of his reunification services and scheduling of a permanent planning hearing were based on erroneous findings that he did not make substantial progress in his court-ordered treatment plan and that there was no substantial probability that Isaiah could be returned to his custody within the 12-month period. We disagree.

Isaiah was removed from his parents' custody after his birth and placed in foster care. For a child under three years of age as of the initial date of his or her removal from a parent's physical custody, services "shall be provided for a period of 6 months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care . . . ." (§ 361.5, subd. (a)(1)(B).) Section 366.21 provides that at the six-month review hearing, the juvenile court "shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

(§ 366.21, subd. (e)(1).) The court may terminate services and schedule a permanent planning hearing if it finds by clear and convincing evidence that a parent has failed to participate regularly and make substantive progress in a court-ordered treatment plan. (§ 366.21, subd. (e)(3).) If, however, the court finds there is a substantial probability that the child may be returned to his or her parent within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing. (§ 366.21, subd. (e)(3).)

Under this statute, the court has discretion to terminate services if it finds that a parent has failed to participate regularly and make substantial progress in a court-ordered treatment plan. However, the court must continue the case if it finds either that there is a substantial probability of returning the child to his parent within six months or that the agency failed to provide reasonable services. (§ 366.21, subd. (e).) Our Supreme Court has held that the statutory period for measuring the probability that a child may be returned to the parent is not extended because a review hearing has been delayed. (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846.) Thus, the six months referred to in the statute encompasses the period of delay, and the court must evaluate whether the child may be returned to the parent within whatever time period remains until the next review hearing. (*Ibid.* ["Thus, if at most four months remain until the next review hearing . . . , at most only four months of services can by law be ordered, and the juvenile court therefore should consider only what the impact of *those* four months of services would be on the parent and child"].) In this case, the six-month review hearing was delayed more than four months, from August 27, 2020, to January 6 and January 19, 2021, which meant that less than two months remained during which the Agency could provide further services. In this

12

circumstance, the question before the court was the probability that Isaiah could be returned to father's custody if an additional two months of services had been provided.

Father argues that the juvenile court erred in concluding that there was no substantial probability that Isaiah might be returned to father within the statutory period because father had substantially complied with his case plan. Therefore, he argues, the juvenile court should have extended his services until the 12-month review.[3]

Contrary to father's argument, there is substantial evidence that he did not substantially comply with his case plan. As the Agency points out, compliance with a case plan alone is not enough; there must be *substantial progress* as well. The courts have interpreted this to mean "substantial progress *towards unification*" or, in other words, toward "addressing the serious problems that led to [the child's] detention." (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1029, 1030 (*Fabian L.*); see also Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2019) § 2.152[5][b][ii] [interpreting "participate regularly and make substantive progress" to encompass "that the parent had participated but failed to make substantive progress" in the court-ordered treatment program].)

Father's case plan, and Gomez's testimony, indicate that father hardly made any progress regarding the stated and overriding goal of the plan: that

---

[3] The Agency bore the burden of proof to establish insufficient participation or insufficient progress by clear and convincing evidence. We are aware of our obligation, in evaluating the sufficiency of the evidence in support of the juvenile court's finding on this issue, to "determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

13

of "[a] safe and sober caregiver who is able to be responsive to his social, emotional, and developmental needs will always care for Isaiah." As mother continued to use drugs and leave treatment programs, the Agency made clear repeatedly that Isaiah's safety included protection from mother and that father, to protect Isaiah from mother, needed to disengage from his relationship with her. There is substantial evidence that he did not do so.

Mother's drug use and the danger she posed to Isaiah's well-being became increasingly apparent over time. Her drug use resulted in Isaiah being born with life-threatening medical complications that required his placement in intensive care for almost three weeks and caused the Agency to initiate this case. Father, by his own admission, knew of mother's drug use by the time Isaiah was born. By March 2020 he necessarily became aware that his failure to protect Isaiah from mother was a basis for the court's assertion of jurisdiction over Isaiah and removal of him from both parents' custody. He knew in the months that followed, because Gomez told him repeatedly, that mother continued to resist treatment and continued to use, and that he needed to end his involvement and contacts with her if he wanted to be reunified with Isaiah. Certainly, he knew by August 2020, when the Agency recommended that the juvenile court terminate his reunification services, that his continued involvement and contacts with mother would cause him to lose his services and, ultimately, his son. As we have indicated, the Agency's August 2020 report referred to the ongoing "co-dependent relationship" between mother and father, the lack of changes in their relationship, mother's continued abuse of fentanyl and father's silence, and concluded that, "[a]lthough the father claims that he does not approve of her lifestyle, he is still a part of it. He does not set health boundaries with mother . . . ."

14

Despite knowing of the Agency's recommendation and concerns, there was substantial evidence that father continued his involvement with mother up until the January 2021 hearing,[4] all the while aware of her continued drug use; continued to give her money that he had reason to suspect she used for drugs; took money from her for rent that the Agency had provided to mother to participate in services; texted with her regarding Isaiah and regularly sent her photos of the child; and only declared that he had ended his romantic relationship with mother at the six-month review hearing. Even then, at the hearing, the most he could muster was to testify that he could impose boundaries "as much as I can" on mother's contact with Isaiah. Further, the court found father was not credible about ending his romantic relationship with mother, a finding that we will not disturb. (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 739 [" ' "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends" ' "].) In short, there was substantial evidence to support the court's conclusion that father had not made substantial progress on a core part of his case plan—to take steps to ensure he could protect Isaiah from mother while she continued her drug use—and that he was concealing his involvement with her. His failure to make progress within the ten months during which he had been provided

---

[4] Mother testified that she did not know she was not supposed to be in a relationship with father until the last time she had been to court. The record indicates she gave this testimony on the second day of the six-month review hearing, January 19, 2021, and that the last time she had been to court in this case was the first day of the six-month review hearing, January 6, 2021. Therefore, it is reasonable to conclude that mother, by her own testimony, was romantically involved with father as of January 6, 2021. This contradicted father's assertion to Gomez in November 2020 that he was no longer involved romantically with mother.

15

services made it beyond unlikely that he would be able to reunify with Isaiah in another two months.

In addition to father's disregard of the agency's directive that he disengage from mother, there was another element of the case plan that he did not meet. The case plan included the requirement that he "obtain the resources and items to enable him to adequately care for Isaiah and provide him a safe home." In her July 2020 visit to his residence, Gomez noticed, among other things, that there was not enough space in father's rented room for Isaiah to sleep in, it was an unheated patio, and there were wires coming out of a socket and heavy items on top of the bed. That same day, she told father about her concerns and discussed with him what changes he needed to make in his home to make it safe for Isaiah. During the January 2021 hearing, because father was appearing by video from his room, the court observed some of these conditions, which had not been rectified at all. Gomez also reported that, as of the time of the January 2021 review hearing, father had not obtained the items needed for Isaiah's care. Father testified that he had obtained certain items and was seeking housing assistance, but the court had doubts about his credibility and, regardless, he took virtually no steps to make these changes for months, even after the Agency's August 2020 recommendation that the court terminate his services. This lack of attention and initiative further supported the trial court's finding of insufficient progress, particularly in light of father's own testimony that he could "try to make it look better, try to make sure there's more space; clean it up better," as if this had just occurred to him and would suffice.

Father's compliance with certain aspects of his case plan that he highlights in his petition, such as his completion of parenting classes and his regular and appropriate visits with Isaiah, does not establish that he made

16

substantial progress toward *reunification*. As the *Fabian L.* court observed, a father's "substantial compliance with *his case plan* must not be confused with the requirement a parent make substantial progress *towards reunification*" with a three-year-old child. The one finding does not automatically compel the other." (*Fabian L., supra*, 214 Cal.App.4th at p. 1029.) "Section 366.21, subdivision (e), does not compel the court to order additional reunification services simply because a parent makes substantial progress with the court-ordered treatment plan. Moreover, the provision gives the juvenile court discretion to schedule a .26 hearing, unless there is a substantial probability the child will be returned to his or her parent in six months or if there was evidence of unreasonable services. (§ 366.21, subd. (e).)" (*Fabian L.,* at p. 1031.)

Likewise, here, father's inattentiveness to the juvenile court and the Agency's core concern about his ability to provide a safe home for Isaiah, by protecting him from a drug-using mother and obtaining a safe dwelling within which to care for him, amply support the juvenile court's finding of insufficient progress. Father's same indifference to these concerns also supports the court's finding that there was no "substantial probability" that Isaiah could be returned to father by the 12-month permanency hearing (§ 366.21, subd. (e)(3)), a matter as to which father had the burden of proof. (See *Tonya M. v. Superior Court, supra*, 42 Cal.4th at p. 847 [indicating it is the parent's duty to "demonstrate a substantial probability of being able to reunite by the 12-month mark"].) That hearing, beyond which no further services could be provided, would have to be conducted within two months. Father offered no meaningful evidence that he would address his failings sufficiently by that time, and the record demonstrates he would not or could not do so.

In short, substantial evidence supports the court's findings of lack of substantial progress and no probability of reunification. Father's claims to the contrary lack merit.

## II.

### *Father's Claim That Insufficient Evidence Supports the Court's Finding That Reasonable Services Were Provided to Him Lacks Merit.*

Next, father argues the juvenile court's finding that he was provided with reasonable reunification services is not supported by substantial evidence. His brief and somewhat muddled arguments are that the court erred because, first, it did not order that a component of his parenting class address boundary-setting between partners and, second, the Agency did not provide reasonable services regarding housing since Gomez purportedly lacked interest in talking in December 2020 with father's Homeless Prenatal case worker. We conclude the court's ruling is supported by substantial evidence.

"[T]he court shall determine whether reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and continued custody of the child have been provided or offered to the parent . . . ." (§ 366.21, subd. (e)(8).) It must find by clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian. (§ 366.21, subd. (g)(1)(C)(ii); see *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594 ["At the six-and 12-month review hearings, the standard of proof for the reasonable services finding is expressly clear and convincing evidence"].) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.)

18

"To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.] . . . [¶] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] If reasonable services are not provided or offered to the parent, the court is required to continue the case for the period of time permitted by statute. (See § 366.21, subds. (e) & (g)(1).)" (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

Father's two brief arguments in support of his claim that the Agency did not provide reasonable services are unpersuasive. The Agency's reports and the testimony of the social worker assigned to his case, Gomez, conclusively establish that the Agency made him aware early and repeatedly that he needed to learn about setting, and begin to set, boundaries with mother for Isaiah's protection if he wanted to be reunified with Isaiah. Further, the Agency made father aware that mother continued to use drugs and to leave treatment programs, making this boundary-setting skill an imperative for reunification, and it provided him with access to a fatherhood program that taught about boundary-setting, which father completed but either did not grasp or did not take to heart.

There also is no evidence to support father's second argument, that the Agency did not provide reasonable services regarding housing because in

19

December 2020 Gomez purportedly was not interested in contacting the case worker at Homeless Prenatal who was helping father. Rather, the record shows that Gomez referred father to Homeless Prenatal in an effort to help him with housing months before father reported that he had contacted the group. Further, Gomez merely testified that she had received two phone messages from the case worker, in late November and mid-December 2020, had not initially called the case worker back, but had spoken to her the morning Gomez was testifying, in January 2021. Further, Gomez testified, she learned that father was not eligible for any further housing services the group might provide, i.e., placement in a homeless shelter, unless he was reunified with Isaiah. Father fails to show the Agency did not offer or provide father with reasonable housing services under these circumstances. True, if Gomez had called back more quickly, she might have been told earlier of the barriers to Homeless Prenatal's ability to help father. But she was in regular touch with father, who could himself have informed her of those difficulties and who did not promptly contact the organization in any event.

In short, father fails to show that the juvenile court erred in ruling that he had been provided reasonable services.

## DISPOSITION

Father's petition is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

20

_____
STEWART, J.


We concur.


_____
KLINE, P.J.


_____
MILLER, J.


*G.P.R. v. Superior Court* (A161884)