Filed 11/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| N.M.,<br><br>  Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>  Respondent;<br><br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>  Real Party in Interest. | A149327<br><br>(Contra Costa County<br>Super. Ct. Nos. J1401192, J1401193) |

   N.M. (Mother) petitions for extraordinary relief under California Rules of Court, rule 8.452,[1] asking us to set aside the juvenile court's order scheduling a hearing pursuant to Welfare and Institutions Code section 366.26.[2] She contends the court lacked discretion to set the hearing because she was not provided reasonable reunification services. We deny the petition on the merits.

## I. BACKGROUND

### A. The Petition and Detention

   The Contra Costa County Children and Family Services Bureau (the Bureau) filed petitions on November 7, 2014, alleging that P.W., then 12 years old, and his sister, M.W., then 11 years old (collectively, the children), came within the jurisdiction of the

---

[1] All undesignated rule references are to the California Rules of Court.

[2] All undesignated statutory references are to the Welfare and Institutions Code.

1

juvenile court.[3] (§ 300.) According to the petitions, Mother caused P.W. serious physical harm, biting and scratching him during an altercation on October 31, 2014, and her untreated mental condition impaired her ability to adequately parent and protect both children, placing them at risk of physical harm or illness.

The detention/jurisdiction report advised that the October 31 altercation began when Mother became upset and began yelling at P.W. for not going to school that day, threatening to send him to military school. Mother slapped P.W., who pushed her in response, and eventually the two were wrestling on the ground. At some point, Mother scratched P.W. on both wrists and under his chin, breaking the skin. P.W. reportedly told his paternal grandmother that Mother also punched him in the mouth. The altercation ended with Mother putting her knees on P.W.'s stomach, pinning him to the floor, and then bending forward to bite him on the right cheek, leaving a quarter-sized bruise.

P.W. told the social worker this was the worst incident between him and Mother, although Mother did sit on him once before while they were arguing, pinning him to the ground. M.W. told the social worker she was present on that earlier occasion and thought it was dangerous because P.W. has asthma and it seemed he could not breathe. Both children said Mother often yelled at them, and would not leave her bedroom for days on end, forcing them to care for themselves, with P.W. often doing the cooking. The children also said Mother had an expired "cannabis card," often smoked marijuana and took Norco to "relax." Neither felt safe in the home. P.W. said he had heard Mother say "she would kill her cousin in her sleep." M.W. said Mother was "kind of mean, all the time."[4]

According to the detention report, family members and close friends had been concerned for the children's well-being, and their older half-sister had moved in with Mother and the children for that reason. The older half-sister told the social worker, "I

---

[3] The children's presumed father (Father) is not party to this writ proceeding.

[4] Although M.W. told police officers who originally visited the home that she felt safe, M.W. later explained, "I didn't want my mom to slap me or hit me if I said I didn't want to stay."

2

won't let [Mother] touch them when I'm there, she knows not to."[5] The children's paternal grandmother said family members had asked Mother to seek treatment, suspecting she might be bipolar.

Mother's former foster mother visited Mother on November 4, 2014, and reported concerns about her mental health, explaining that Mother had threatened to harm herself if the children were removed. When interviewed by the social worker the next day, Mother was crying, could not make eye contact, and agreed she was depressed. She admitted to biting P.W. but claimed she did so in self-defense, saying he was "out of control" and yelled at her "all the time." After the interview, Mother was placed on a 72-hour psychiatric hold under section 5150. The children were detained and placed in separate foster homes.

### B. Jurisdiction and Disposition

At the jurisdictional hearing on January 26, 2015, the court dismissed the substance abuse allegation after Mother agreed to submit to drug testing and to participate in a substance abuse treatment program if she missed a test or tested positive. The court sustained the petition's remaining allegations, finding P.W. and M.W. to be dependent children of the court, and granted Mother supervised visitation of at least one hour weekly, instructing the Bureau to consider the children's wishes and their therapists' input in deciding the frequency, time, place, and length of those visits.

The following month, the Bureau prepared a disposition report. The report advised that Mother had several previous dependency cases dating back to 1994. Her parental rights to two other children had been terminated, and those children were adopted. Between 2004 and 2006, there was also a dependency case involving P.W. and M.W., with allegations of general neglect, physical abuse, and substantial risk, which concluded in reunification.

---

[5] The older half-sister also reported, "I know how [Mother] treats [the children]; it's how she treated me."

3

According to the disposition report, Mother said her own mother was schizophrenic, and that she had anxiety and had struggled with depression throughout her life herself. In a follow-up report dated April 23, 2015, the Bureau advised that Mother had been prescribed medication used to treat depression, anxiety, and panic disorders, and that the social worker had left a message for the prescribing physician, Dr. Khan. Mother had begun seeing a new psychiatrist in the meantime, the report continued, and had been assigned a new therapist. She also had her first supervised visit with M.W. in April. Although Mother had not begun visitation with P.W., and P.W. had stated he did not want to visit with her, the social worker reported that she hoped to receive input from P.W.'s therapist on the topic soon.

At the disposition hearing on June 11, 2015, the juvenile court adjudged the children to be dependents of the court, finding that their welfare required they be removed from Mother's physical custody, and ordered that Mother be provided at least one hour of supervised visitation twice per month as well as reunification services. The court adopted the reunification plan that the Bureau had recommended, which, among other things, required Mother to complete a psychological evaluation; complete a domestic violence assessment and counseling; complete anger management and parenting classes; meet weekly with an individual therapist; and submit to weekly substance abuse testing, and enter a substance abuse treatment program if she tested positive for a controlled substance or missed a test.

**C. Six-Month Review Hearing**

A six-month review hearing was held on November 4, 2015. The Bureau filed a supplemental report for this hearing, advising that Mother had been participating for almost four months in an outpatient substance abuse treatment program, had completed random substance abuse testing with only one missed test and all negative results, had completed one parenting program, was nearing completion of a second parenting program, and had been attending weekly individual therapy sessions focused on regulating her emotional control, parenting, and domestic violence support. Mother had advised the social worker she was seeing a new psychiatrist, but had not yet obtained a

4

psychological evaluation, and still needed to complete a domestic violence program, and the Bureau recommended giving her six more months to do both.

The children, by then, were living together in the same foster home, and attending school, the Bureau reported. They also had been attending weekly therapy sessions since April. Although Mother wanted to visit with the children, their therapist initially recommended against it until they had progressed further in therapy, as both children still strongly expressed that they did not want to visit Mother. Just two days before the six-month review hearing, however, the Bureau reported, M.W. changed her mind, wanting to visit with her mother on her birthday, a step the therapist approved.

The juvenile court again adjudged the children to be dependents of the court, found that reasonable services had been offered or provided to Mother, found that the children's return to the family home would create substantial risks to their well-being, and ordered continuation of reunification services until the 12-month review hearing. The court ordered that Mother be permitted to visit the children for at least one hour weekly, with the Bureau to establish the actual frequency, time, place, and length of those visits, taking into account the children's wishes and their therapist's input. Mother was granted leave to telephone the children's caregiver up to two times each week, on weekdays before 3 p.m., to receive updates about the children, and the children were to be permitted to telephone their mother without limitation.

### D. 12-Month Review Hearing

A 12-month review hearing took place on January 25, 2016.[6] The Bureau advised, in a supplemental report dated January 4, that Mother continued doing well in her outpatient substance abuse program, participating in groups, and testing negative for controlled substances. Although she needed to complete an anger management class and a psychological evaluation, it reported, she was attending job training classes and meeting weekly with an individual therapist, focusing on emotional control, parenting, and

---

[6] Unless otherwise specified, all remaining events relevant to this matter occurred in 2016.

5

domestic violence support. She was taking her medication, had had some supervised visits with M.W., which had gone well, and overall, the Bureau reported, had "made tremendous progress." Mother continued expressing a desire to participate in services and to reunify with the children, even though P.W. still refused to visit with her and M.W. wanted to visit only infrequently. As M.W. appeared to want a relationship with Mother, the Bureau expressed the hope the two might commence family therapy with M.W.'s therapist in the near future.

At the conclusion of the January 25 hearing, the court again adjudged the children to be dependents of the court, finding a substantial risk to their well-being if they were returned to the family home, although it found that Mother had made significant progress toward reunification. Concluding that reasonable services had been provided or offered to Mother, the court ordered continuation of those services until the 18-month review hearing, which it scheduled for May 2, and it approved a new reunification plan, among other things, giving Mother more time (until May 4) to complete a psychological evaluation. The court ordered that Mother be provided at least one hour weekly of visitation, with the Bureau to establish the frequency, time, place, and length of visits after considering the children's wishes and their therapists' input.[7]

### E. 18-Month Permanency Review Hearing

#### 1. *May report*

On May 2, when the parties convened for the 18-month permanency review hearing, the Bureau recommended the court terminate Mother's reunification services and set a selection and implementation hearing pursuant to section 366.26. Mother's two family therapy sessions with M.W. in February appear to have provided the turning point.

Although Mother had successfully completed some of her obligations under the reunification plan, the Bureau observed in its 18-month review report, after January, she stopped submitting to drug tests and stopped attending individual therapy sessions. The

---

[7] The court also limited Mother's rights to make decisions about the children's education.

children continued to feel unsafe with Mother, the Bureau reported, and the relationship continued to be emotionally detrimental for them. These problems were manifest in the February family therapy sessions, which the Bureau described as "very emotionally harmful" to M.W., and M.W.'s therapist described as "not therapeutic at all."

In a letter that the Bureau attached to its 18-month permanency review report, the therapist advised that M.W. initially had been "very resistant" to meeting with Mother for family therapy, fearing Mother would not control her emotions and would pressure M.W. to reunify, making M.W. feel guilty. To avoid this result, at M.W.'s request, the first family therapy session was held in a public location and M.W.'s foster mother was present. The second session occurred in the therapist's office at Mother's request, after Mother agreed she would leave the session if she could not control her emotions.

Despite this agreement, the session was not a success. According to the therapist's letter, although M.W. said in the session that she wanted to establish and build a healthy relationship with Mother, Mother focused instead on denying responsibility for the children's removal from her care, emphasizing P.W.'s role in that event, and repeatedly insisted she was not willing to participate in family therapy if M.W. was not going to reunify with her. Meeting individually with her therapist after the family therapy session, M.W. reportedly expressed distress and disappointment, saying she felt Mother was using her, participating in reunification services only to resume receiving a "government check," and also confided that Mother had threatened after the session to do "whatever" was necessary to get her back. Although the therapist reported she attempted to contact Mother after the second session, she said she received no response and, accordingly, recommended discontinuing family therapy for a time until greater progress could be made in individual therapy.

At the May 2 hearing, the juvenile judge said she was "very disappointed to read that [M.W.] made herself available and really wanted to work on her relationship with her mother and her mother was really unable to focus on [M.W.] and building that relationship." The juvenile court then scheduled a contested permanency review hearing for the parties to address the Bureau's recommendation that it terminate services.

7

## *2. June report and hearing*

The Bureau provided a new supplemental report, dated June 23, for the contested permanency review hearing. The report concluded that P.W. truly did not want a relationship with Mother, noting he consistently had refused to visit or attend therapy with her for 19 months and recently seemed upset that the social worker continued suggesting he do so. The report also noted that M.W. felt very violated by her family therapy sessions with Mother.

The Bureau did acknowledge some gains in its June report. It advised that M.W. had initiated a supervised visit with her mother on Mother's Day, which was successful, and Mother had begun attending the children's church, a development that drew no objection from P.W. Mother also reported she was enrolled to begin an anger management class in three weeks, and had completed a psychiatric evaluation.

The social worker followed up on the latter point, the Bureau advised, obtaining an oral report from the evaluating psychiatrist, Dr. Brody. The psychiatrist confirmed he began seeing Mother in July 2015 and, although she missed a lot of their appointments, they did have four in-person sessions and one by telephone, after which he referred her to another provider. Mother initially presented with depression and anxiety, Dr. Brody reported, and he ultimately diagnosed her as having major depression with psychotic features.

Despite Mother's modest recent gains, however, the Bureau advised, it continued to recommend terminating reunification services. After 18 months of services, it observed, Mother's relationship with the children remained unstable and the children did not feel safe returning to her care. Additionally, Mother had not successfully completed her obligations under the reunification plan. She stopped attending individual counseling sessions or submitting to random drug testing after completing her outpatient substance abuse program in January. Although recently she had resumed drug testing, and tested clean on June 2, Mother was a "no show" again on June 8, and did not complete her anger management program by the most recent deadline.

The contested permanency review hearing commenced on June 27 with Mother's testimony. As testimony did not conclude on that date, the matter was continued, initially until July 8, and then until August 23 at Mother's request following her granddaughter's hospitalization.

### 3. August report

The Bureau provided a final report before the hearing resumed on August 23. The report stated that Mother had completed three random drug tests in June with negative results, but failed to appear for testing eight times, including on all scheduled dates in July and August. Mother also reportedly had attended three or four sessions of an anger management and domestic violence class, but had missed one session to babysit grandchildren and had advised she would miss a second due to a conflicting appointment.

The social worker reported she had spoken to a therapist who provided Mother independent counseling in May and July, 2015. The therapist reportedly conveyed that she had been unable to complete a formal assessment because Mother could not remain focused and was inconsistent in her visits. Mother had a lot of anxiety, had difficulty managing anger, and needed medications to calm down, the therapist said. Although the appointments were free, and the therapist offered to continue their sessions, the report advised, Mother stopped attending, saying that it was hard for her to get to the appointments.[8]

Finally, the social worker's status report addressed visitation, advising that the children were still seeing Mother at church, and M.W. had spoken to Mother both at church and by telephone, with her caregiver supervising. Although M.W. had expressed an interest in future visits, provided she could be the one to initiate them, the social worker reported, none had occurred since the June 23 court hearing, and P.W. still did not want to visit Mother.

---

[8] Mother was able, however, to secure transportation passes from the Bureau when she wished to do so.

### *4. August hearing*

Mother did not appear when the permanency review hearing resumed on August 23, and the court denied her request for a further continuance. It granted the Bureau's motion to strike Mother's earlier testimony because she was not available to complete cross examination. After hearing from all parties, the court found by a preponderance of the evidence that returning the children to Mother's physical custody would create a substantial risk of detriment to the children's safety and physical or emotional well-being, remarking this was "not even a close call." Applying the same standard, it found Mother had been offered reasonable reunification services. The court then declined to continue the matter for six more months, concluding, among other things, it "[could not] possibly" find by clear and convincing evidence that providing Mother additional reunification services would be in the children's best interests, because both still feared Mother and opposed the Bureau's scheduling visitation. Instead, it scheduled a hearing pursuant to section 366.26 for December 12, terminating Mother's reunification services.

## II.  DISCUSSION

Mother contends the court lacked discretion to set a section 366.26 hearing because the evidence does not support the finding that she received reasonable reunification services. We disagree.

### A. Statutory Framework

At an 18-month permanency review hearing, a "court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . .  In making its determination, the court shall review and consider the social worker's report and recommendations . . . ; [and] shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself of services provided . . . ."  (§ 366.22, subd. (a)(1).)

10

If a court finds that returning a child to his or her parent would create a substantial risk for a child, subdivision (b) of section 366.22 provides a parent "a limited right" to a continuance of up to six months in certain circumstances. (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504 (*Earl L.*).) The continuance is available only if "the court determines by clear and convincing evidence that the best interests of the child would be met" by providing "additional reunification services to [1] a parent . . . who is making significant and consistent progress in a court-ordered residential substance abuse treatment program, [2] a parent who was either a minor parent or a nonminor dependent parent at the time of the initial hearing making significant and consistent progress in establishing a safe home for the child's return, or [3] a parent recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security and making significant and consistent progress in establishing a safe home for the child's return . . . ." (§ 366.22, subd. (b).) "In *these* cases, the juvenile court may not set a section 366.26 hearing if [it] finds reasonable reunification services have not been offered or provided [to the parent]." (*Earl L., supra*, at p. 1504, italics added; § 366.22, subd. (b) ["The court shall not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian"].)

If a court finds that returning a child to his or her parent would create a substantial risk for a child, and subdivision (b) of section 366.22 does *not* apply, for example, because the court determines by clear and convincing evidence that continuation of reunification services is not in the child's best interests—then "the court *shall* order that a hearing be held pursuant to Section 366.26" and "*shall* also order termination of reunification services to the parent . . . ." (§ 366.22, subd. (a)(3), italics added.) Although the juvenile court still must make a finding regarding whether reasonable services have been offered in such circumstances, its authority to set a section 366.26

11

hearing " 'is *not* conditioned on a reasonable services finding.' " (*Earl L., supra*, 199 Cal.App.4th at p. 1504; §366.22, subd. (a)(3).)[9]

**B. Analysis**

At the 18-month permanency review hearing in this case, as noted, the juvenile court found, by a preponderance of the evidence, that returning the children to Mother would create a substantial risk of detriment to them. Mother does not challenge this finding. Instead, she contends the juvenile court lacked discretion to set a section 366.26 hearing because she did not receive reasonable reunification services.

In contending that reasonable reunification services are a precondition to a court's setting a section 366.26 hearing, Mother does not rely on or even acknowledge the statute that governs 18-month permanency review hearings (§ 366.22). Instead, she cites rule 5.708, subdivision (m), which provides, "At any 6-month, 12-month, or 18-month hearing, the court may not set a hearing under section 366.26 unless the court finds by clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." As applied to an 18-month permanency review hearing, however, this language is misleading. (*See Earl L., supra*, 199 Cal.App.4th at p. 1505.)

In 1991, the Legislature amended former section 366.22 to delete the requirement of a reasonable services finding as a *precondition* of setting a section 366.26 hearing. (See *Mark. N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1015–1016 & fn. 9, quoting Legis. Counsel's Dig., Sen. Bill No. 475 (1991–1992 Reg. Sess.) Summary Dig., p. 352 ["This bill would require a court to determine whether reasonable services have been

---

[9] Section 366.22, subdivision (a)(3) provides in pertinent part as follows: "Unless the conditions in subdivision (b) are met and the child is not returned to a parent . . . at the permanency review hearing, the court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, . . . guardianship, or continued placement in foster care is the most appropriate plan for the child. . . . The hearing shall be held no later than 120 days from the date of the permanency review hearing. The court shall also order termination of reunification services to the parent . . . . The court shall continue to permit the parent . . . to visit the child unless it finds that visitation would be detrimental to the child. The court shall determine whether reasonable services have been offered or provided to the parent."

offered or provided to the parent . . . *but would delete that requirement as a precondition for developing a permanent plan*"], italics added; Stats. 1991, ch. 820, § 4, p. 3647 [enacting Sen. Bill. No. 475].)  Following this amendment, the juvenile court's authority at an 18-month permanency review hearing to set a section 366.26 hearing is not conditioned on a reasonable services finding.  (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1511–1512.)

In 2009, section 366.22 was amended again to allow a juvenile court, at an 18-month permanency review hearing, to grant one further continuance of up to six months, and order additional reunification services for the parent in limited circumstances. (Stats. 2008, ch. 482, § 3, pp. 3439–3441; see *Earl L., supra*, 199 Cal.App.4th at p. 1504.)  In those limited circumstances, a court may not set a section 366.26 hearing unless it finds by clear and convincing evidence that reasonable reunification services were provided.  (§ 366.22, subd. (b); see *Earl L., supra*, at p. 1503.)

Mother does not contend that this provision applied here, however, and with good reason, as it did not.  Most importantly, as previously noted, a juvenile court has discretion to grant the continuance and order additional reunification services *only* if it determines by clear and convincing evidence that those actions serve the child's best interests.  (§ 366.22, subd. (b).)  This was not the case here.  At the 18-month permanency review hearing, the juvenile judge said she "[could not] possibly" find by clear and convincing evidence that it was in the children's best interests to provide Mother additional reunification services, because both children still feared Mother and opposed the Bureau's scheduling visitation.  Mother does not suggest that the court erred in this finding, or that the clear and convincing weight of the evidence showed it was in her children's best interest to provide her additional reunification services.  Having reached the conclusion it did—that returning the children to Mother's custody would create a substantial risk of detriment to them, and that it was not in children's best interest to provide Mother additional reunification services—the juvenile court lacked discretion to grant a further continuance or to order additional reunification services.  (§ 366.22, subd. (a)(3).)  Stated another way, the court was obligated to take the actions that it did

take, i.e., setting a section 366.26 hearing, and terminating Mother's reunification services.[10]

Even if the adequacy of the reunification services provided to Mother was relevant in determining her right to a further six-month continuance of the permanency review hearing, we agree with the Bureau that Mother waited too long to raise this issue. Mother does not claim, and nothing in the record indicates, that she objected to the adequacy of the services provided to her at any point before the final day of the 18-month permanency review hearing, on August 23, a date more than 20 months after the children's initial removal from her custody. There is no indication, for example, that she objected at the 6- or the 12-month review hearings to the juvenile court's finding she was offered or provided reasonable reunification services. Even on August 23, Mother only objected to the adequacy of the visitation services that she had received, voicing no objection then to the sufficiency of the mental health services or referrals that she had received, a point now raised for the first time in her petition.

"Many dependency cases have held that a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court." (*In re Lorenzo* (1997) 54 Cal.App.4th 1330, 1338.) A parent may not "wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing. [Citation.]" (*Earl L., supra*, 199 Cal.App.4th at p. 1505.) As some courts have noted, "any other rule would permit a party to trifle with the courts. The party could deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." (*In re Lorenzo, supra,* at p. 1339.) Mother's delay in challenging the adequacy of the reunification services offered or provided to her is fatal to her argument. Accordingly, we do not reach Mother's other contentions.

_____

[10] To the extent rule 5.708, subdivision (m) purports to provide otherwise, it conflicts with section 366.22. (See *Earl L., supra*, 199 Cal.App.4th at p. 1505; see also Cal. Const., art. VI, § 6, subd. (d) [rules of court "shall not be inconsistent with statute"].)

14

## III.  DISPOSITION

The petition is denied on the merits.  (§ 366.26, subd. (*l*)(1)(C); Rule 8.452(h); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.)  The request for a stay of the December 12, 2016 hearing is denied.  Our decision is final as to this court immediately. (Rule 8.490(b)(2)(A).)


_____

Rivera, J.


We concur:


_____

Ruvolo, P.J.


_____

Streeter, J.

15

N.M. v. Superior Court (A149327)

| | |
|---|---|
| Trial Court: | Contra Costa County |
| Trial Judge: | Hon. Rebecca C. Hardie |
| | |
| Counsel for Petitioner: | Brian D. Hufford |
| Counsel for Respondent: | No appearance |
| | |
| Counsel for Real Party in Interest: | Sharon L. Anderson, County Counsel; Carol Nguyen, Deputy County Counsel |