Filed 2/21/25  S.V. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.V.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Real Party in Interest. | F088973<br><br>(Super. Ct. No. JD145421-00)<br><br>**OPINION** |

## THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Susan M. Gill, Judge.

S.V., in pro. per., for Petitioner.

No appearance for Respondent.

---

\*　　Before Detjen, Acting P. J., DeSantos, J. and Gregory Fain, J.†

†　　Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

No appearance for Real Party in Interest.

-ooOoo-

Petitioner S.V. (mother), in propria persona, seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) from the juvenile court's orders made at a six-month status review hearing (Welf. & Inst. Code,[1] § 366.21, subd. (e)) setting a section 366.26 hearing for March 13, 2025, as to her minor son, W.B.,[2] specifically: (1) terminating her reunification services; (2) denying W.B.'s biological father A.S.'s section 388 petition for reunification services; and (3) granting W.B.'s relative care providers' request to be recognized as de facto parents. Mother makes several assertions of error, all of which are either not properly before us in this writ proceeding or without merit. She also seeks a stay of the section 366.26 hearing.

We deny the petition and request for a stay.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2023, the Kern County Department of Human Services (department) received a referral alleging general neglect of infant W.B. by mother. The referral indicated mother was suffering from bipolar disorder, depression, and bulimia. It was alleged that mother and the maternal grandmother, Laura V., had agreed the maternal grandmother would care for the child while mother increased her medication. When mother tried to pick up W.B. from maternal grandmother, Laura refused to return him to mother due to safety concerns.

During investigation of the referral, Laura explained that she took W.B. from mother's care because he was "filthy and disgusting"; his clothes where dirty and he smelled of urine and feces. Later, mother called law enforcement in order to pick up

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    The petition filed states the child's name has the initials W.W.; however, the court ordered the child's name corrected with the initials W.B. in January 2024.

W.B. from Laura. When sheriffs arrived, Laura played voice messages for them where mother stated she hated W.B. and mentioned killing herself, and Kern County sheriffs determined W.B. would be safe in Laura's care. Later, however, Ridgecrest police went to Laura's house and told her she needed to give W.B. back to mother. Laura reported she was concerned for W.B.'s safety in mother's care because she is mentally unstable.

The Ridgecrest police officer who performed a welfare check following the return of W.B. to mother's care reported to the social worker that W.B. was not present in the home during the check, as mother stated she needed "me time" and had called a friend to pick up W.B. Mother reported she had used methamphetamine prior to the officer coming to her home and had used three separate times the past week. The officer did not arrest mother for child endangerment because W.B. was not in the home though he expressed concerns to the social worker regarding mother's mental health as she reported she had never taken her psychotropic medication as prescribed and did not want to. The home was cleared by law enforcement because W.B. was not present. The department's referral for general neglect was deemed substantiated.

A few days later the department received a second referral alleging severe neglect. It was alleged Laura took W.B. to the emergency room because she was concerned he had gotten assaulted or gotten into illegal substances. He presented with a bruise/moderate hematoma to the right side of his forehead, rapid eye movement, deviation of one of his eyes, and mottled skin. During the social worker's investigation, W.B. was placed back in mother's care, and mother was given information on Differential Response (DR) services. The referral was deemed inconclusive.

On January 4, 2024, mother accepted DR services. Mother disclosed she last used methamphetamine on December 11, 2023, and had mental health issues. On January 8, 2024, the department received results that mother had tested positive for methamphetamine on December 18, 2023. The social worker visited mother's home that

day to drug test her. Mother appeared "to be very on edge," "out of it," and "not fully knowing what was going on" and was unable to provide a sample.

The following day, W.B. attended a medical appointment, and the doctor was "definitely concerned with … 'nystagmus.' " The doctor reported to the social worker that mother's behavior of "pressured speech" and disorganized thought process suggested to her she may not be taking her bipolar medication.

Later, during a home visit, mother disclosed she had concerns about W.B. having seizures but avoided medical appointments because she had a bad experience at the hospital where she gave birth. She further stated she had only used methamphetamine once—on December 11, 2023. She got upset during the home visit and raised her voice and W.B. started to cry. She disclosed to the social worker that earlier she had "spazed out" and yelled and broke glass because she was upset, all while W.B. was in her care. The social worker advised mother she needed to control her emotions when the baby was around, to which mother said "no" and explained because she had bipolar disorder she is allowed to lose control.

On January 10, 2024, then three-month-old, W.B. was placed into protective custody, and the department filed a dependency petition on his behalf. The petition alleged that W.B. had suffered or was at risk of suffering physical harm due to mother's inability to provide care to him due to mental illness and substance abuse. It was specifically alleged that mother used methamphetamine and was suffering from untreated bipolar disorder.

The social worker subsequently informed mother her voluntary case plan consisted of parenting/neglect classes, substance abuse services, a mental health assessment and recommendations, and random drug testing. Mother stated it would be difficult for her to participate in services because she was a student and school was starting. She agreed to drug test but was unable to provide a sample.

4.

At the initial hearing conducted on January 12, 2024, the juvenile court ordered W.B. detained from mother. Mother was ordered twice weekly two hour supervised visits.

Following the detention hearing, mother expressed to the social worker she was unsure if she could handle visiting with W.B. because she would not be able to take him home. She also expressed that her brain would not let her look into her voluntary case plan components and that she had been wrongfully accused. When the social worker encouraged mother to visit W.B., she responded, "I doubt I will. I can't." She later expressed she was not doing well after losing W.B. because he was the only reason she kept living. She admitted to using methamphetamine on January 18, 2024, but that she would not have done so if W.B. had not been removed from her care.

Mother visited W.B. on January 19, 2024. Throughout the visit, mother spoke poorly of Laura and used profanity. When the worker supervising the visit tried to redirect mother from inappropriate subjects and language, mother responded that she did not care and had the right to talk to her baby about anything she wants. Mother requested the visit end early.

The following day, mother told the social worker she was stressed about what to do with W.B. during visits. The social worker gave mother some suggestions and provided her with a list of resources for enrolling in services and told mother she could reach out to her if she had any questions.

Laura reported that on January 22, 2024, mother cancelled a medical appointment W.B. had with an ophthalmologist at his pediatrician's advisement because mother maintained there was nothing wrong with him.

On January 23, 2024, mother called the social worker to express concern about W.B.'s wellbeing in Laura's care. When the social worker advised mother not to cancel W.B.'s medical appointments, mother stated she would continue to do so because she "is petty like that and that nothing is wrong with her son." When asked about her case plan

components, mother responded that she did not know where to start so she probably was not going to do it. The social worker encouraged her to focus on her case plan, and mother said she did not have the mental capacity to do that and she could not focus until she knew W.B. was properly taken care of. Mother stated she needed someone to sit down with her on a good day to help her enroll in her case plan components. The social worker reminded mother she had provided her with an extra portion of the resource directory on which she highlighted the classes in Ridgecrest and Bakersfield and the ones that were free.

Mother called the social worker minutes later informing the social worker that she signed up for her parenting/neglect classes. She stated that she had also called different providers for the substance abuse class, but they needed to bill insurance. She reported she was on her parents' insurance, and her father was not responding. The social worker encouraged mother to continue calling her father for the information and contact other providers as well. Mother also made an appointment for her mental health assessment.

Mother later reported to the social worker she did not attend her mental health assessment because she forgot. Though she had signed up for parenting classes to begin in April 2024, she reported she would not be attending because she wanted to fight the case on her own. She stated she would not be attending more visits with W.B. because she could not mentally handle it.

In February 2024, Laura reported that mother was interfering with W.B.'s medical care and appointments. W.B. was recommended to have both vision therapy and gross and fine motor therapy, and mother refused to sign paperwork for the treatment. On one occasion, at a medical appointment for W.B., mother yelled and cussed and had to be escorted out of the building; she accused the doctor of making up lies and insisted W.B. had nothing wrong with him. At another appointment, mother again refused to listen to recommendations from the doctor insisting that W.B. did not need any therapy and got angry and stormed out.

Based on this information, W.B.'s counsel requested an ex parte hearing on his request to limit mother's developmental rights and restrict her from interfering in medical and developmental appointments.

On February 21, 2024, the court granted the ex parte petition and ordered that mother was not to be told in advance of medical appointments, was not to attend, and was to be told about them after they had been held. The court further ordered that if medical treatment was needed and mother did not consent, authorization was to be sought from the court. The parents' right to make educational and developmental decisions was limited, and Laura was appointed to make the educational and developmental decisions for W.B.

On February 24, 2024, when mother was contacted regarding a scheduled Child and Family Team Meeting, she responded, "I won't be speaking to [social worker] or any social workers for the rest of the case. Have a good day."

The department obtained mother's psychiatry records from September 2023 to December 2023. In September 2023, she reported being "sad all the time," and the doctor noted she exhibited poor insight and judgment into and about her mental health issues. She was prescribed 20 mg. of Latuda. In October 2023, mother reported stopping her medication. She was diagnosed with bipolar disorder and prescribed 25 mg. of Seroquel. In November 2023, her Seroquel was increased to 50 mg., and she was also prescribed 10 mg. of Lexapro. From September 2023 through November 2023, she described having seven personalities that argue with each other. In December 2023, her Seroquel was continued, and her Lexapro was increased to 20 mg.

Between December 2023 and February 2024, mother did some drug testing; the results were three positive for amphetamine and methamphetamine, with two of those also being positive for cocaine, and three no shows.

On March 13, 2024, the court conducted a jurisdictional hearing; mother was present. The court found the petition true and that W.B. was described by section 300,

subdivision (b). The court ordered mother to undergo a psychological evaluation to determine whether she would benefit from reunification services, and if so, what type of services would be beneficial. The court lifted the order restricting mother from attending medical appointments; mother was permitted to attend appointments but could not cancel them. The court continued the matter for disposition.

Between the jurisdiction hearing and the date set for the disposition hearing, mother did not attend any visits with W.B. Mother refused to attend her psychological evaluation despite encouragement and transportation offers from the department. She also refused to attend visits despite department encouragement because she stated it was too much for her. At several points during the review period, mother told the social worker to stop contacting her. At one point, she stated she would call the police if anyone from the department went to her house. She missed drug testing in March and April. In its disposition report dated April 22, 2024, the department recommended mother be bypassed for reunification services because she was refusing to attend the psychological evaluation.

On the date initially set for the disposition hearing, April 26, 2024, the court declared alleged father Anthony S. W.B.'s biological father. The court granted mother a continuance because of the department's bypass recommendation. After the hearing, the social worker approached mother regarding her psychological evaluation, and mother loudly stated she did not want to speak to her.

Mother attended her psychological evaluation on May 2, 2024. The clinician opined mother was a good candidate for reunification services. She recommended mental health treatment and noted "[i]t is imperative that [mother] continue to undergo mental health treatment and this should be monitored closely to ensure her compliance with treatment. Specifically, there should be a complete diagnostic assessment completed to determine if she is suffering from Postpartum Depression as I suspect she is." The clinician also recommended parent effectiveness training, a child neglect/endangerment

class, and mental health counseling, "specifically to address her history of trauma." Accordingly, the department changed its recommendation to granting reunification services for mother.

The uncontested disposition hearing was conducted on May 29, 2024; mother was present. The court adjudged W.B. a dependent of the court and removed him from mother's custody. Mother was deemed to have made no progress toward alleviating the causes for out-of-home placement. She was ordered to participate in reunification services, including substance abuse counseling, 26 weeks of parenting and child neglect/endangerment classes, a mental health assessment and recommended treatment including medication management, and random drug testing.

In June 2024, counsel for W.B. filed another request for an ex parte hearing on his request for an order that mother not reschedule or interfere in W.B.'s medical appointments, as she continued to interfere.

The ex parte hearing was conducted on June 27, 2024, and Laura testified that mother recently attended a medical appointment and accused Laura of hurting W.B. and medical neglect. Mother was asked to leave the appointment and became volatile, screaming profanities and threatening to key Laura's car. The therapist performing an assessment on W.B. was unable to get clear answers due to mother's interference and had to meet Laura later to deliver a diagnosis. After hearing testimony and arguments from the parties, the juvenile court granted the request.

On September 6, 2024, W.B.'s counsel filed a request for a juvenile restraining order protecting W.B., Laura, and Laura's husband from mother. Attached to the request was a declaration by Laura asserting that mother attended a haircut for W.B. and got angry with Laura and began screaming and calling Laura names. Laura further asserted mother had physically assaulted her in the past and was afraid that she might do something to her while W.B. was in her arms. The court granted a temporary order on September 10, 2024.

9.

At the hearing on the restraining order on October 17, 2024, mother was not present. The court found good cause to issue the order restraining contact except for brief and peaceful contact for the purpose of court ordered visitation and visitation exchanges. The order also specified mother was not to have possession of firearms or ammunition.[3] The order was to keep mother away from medical appointments and was to remain in effect for a period of three years.

Leading into the six-month status review hearing, father filed a section 388 petition requesting reunification services, on which the court granted a hearing. Additionally, Laura and her husband filed a request to be recognized as de facto parents, and the court ordered a hearing on the request as well.

In the department's six-month status report dated November 12, 2024, it recommended the court terminate mother's reunification services and set a section 366.26 hearing. The department documented several attempts to contact mother by telephone or mail regarding her case plan from June 2024 through October 2024. The department either could not make contact or mother refused to speak with the social worker. It did not attempt in-person contact with mother "due to safety concerns with her being hostile previously." During the review period, mother provided no proof that she was in compliance with any of the components of her case plan and did not attend any visits with W.B.

On November 18, 2024, the juvenile court conducted the six-month review hearing, a hearing on father's section 388 petition, and a hearing on the grandparents' request to be recognized as W.B.'s de facto parents.

---

[3] In minor's request for the restraining order, in response to the form question regarding whether the restrained person had firearms, the box "I don't know" was checked.

10.

County counsel noted the department's report was filed late and "ask[ed] that that be waived." Mother's counsel indicated she was able to read the report and had "no problem" waiving any notice defect. Father's and minor's counsel also waived notice.

The court first asked for a status on the order for mother to return firearms and asked mother's counsel if she was aware of any firearms mother had. Mother's counsel responded that she was not aware of mother having any firearms or whether she had complied with the previous firearm orders. Counsel noted it was her "first time in weeks speaking to [mother] last night." After consulting with father and Laura, who were not aware of mother having firearms, the court continued "the order in effect that she is not to have any firearms, firearm parts, or ammunition in her possession or control."

The court next took up father's section 388 petition. Father testified in support of his petition. Mother's counsel joined in father's arguments "[t]o the extent that we can," and stated that mother was in support of father's petition being granted "so that he can participate in reunification services with his son." After hearing argument from the parties, the court denied the petition.

The court next took up the six-month review hearing. Mother's counsel submitted on the reports, noting "[a]s far as the law is concerned, the Court would not be able legally, given the facts, to grant an additional six months. That's obvious." Counsel added she "had a really good and long conversation with [mother] last night" and went on to state:

> "[I]t was clear to me [mother] knows what the recommendation is. She understands that the Court would not be able, based on the facts to move forward with an additional six months. But one of the things I want to applaud is, it may be late for her understanding that services are needed. It may be late as far as the six[] month[s are] concerned, but as far as life is concerned, it's not late. My client indicated to me, wanted me to let the Court know, that she's going to be starting services. And in life, maybe not for the six months but that's a win."

11.

Counsel continued, stating she hoped mother would follow through and that she looked forward to bringing a section 388 petition. With those comments, she submitted the matter. The other parties submitted as well.

The court found mother had made no progress toward alleviating or mitigating the causes necessitating placement and had not made acceptable efforts nor availed herself of services provided to facilitate return of W.B. The court found the return of W.B. would create a substantial risk of detriment to his well-being. The court further found that W.B. was under the age of three when removed and mother had failed to participate regularly and make substantive progress in a court-ordered treatment plan, and there was not a substantial probability W.B. could be returned within the 12-month period which would end in March 2025. The court ordered mother's services terminated. The court further found the department had complied with the case plan by making reasonable efforts and providing reasonable services to return W.B. The court set a section 366.26 hearing for March 13, 2025.

Finally, the court asked if there was any objection to the grandparents' request for de facto parent status, and mother objected but counsel "ha[d] nothing to put forward to the Court." At this point in the proceedings, mother personally addressed the court[4] and wished to make comments with respect to father's section 388 petition. The court explained it was father's motion, and mother was not called as a witness and that mother did not have standing. Mother's counsel commented that she agreed mother did not have standing and that what she believed mother wanted to speak about could be included in a future section 388 petition. The court granted the request for de facto parent status.

The court then asked mother if she had any firearms, which mother answered in the negative.

---

[4]     It appears mother arrived at the hearing after it had started, as counsel stated at the outset of the hearing mother was not present.

The court concluded the hearing.

## DISCUSSION

I.     **Jurisdictional and Procedural Issues**

A.     *Standing*

"Generally, parents can appeal judgments or orders in juvenile dependency matters. [Citation.] However, a parent must also establish she is a 'party aggrieved' to obtain a review of a ruling on the merits. [Citation.] Therefore, a parent cannot raise issues on appeal from a dependency matter that do not affect her own rights. [Citation.] Standing to appeal is jurisdictional." (*In re Frank L.* (2000) 81 Cal.App.4th 700, 703.)

### 1.     **Father's Section 388 Petition**

Mother challenges the denial of father's section 388 petition for reunification services. Her primary concern about the denial is that she was denied an opportunity to speak regarding the petition and wanted to give the court more context on one of the issues.

The juvenile court could have reasonably determined mother did not have standing to offer evidence in support of father's petition, which mother's counsel conceded. (See *In re D.S.* (2007) 156 Cal.App.4th 671, 673–674 [a parent does not have a stake in another parent's visitation or reunification services with their child].) Here, father did not call mother to testify, and mother did not seek to offer evidence until after the court had already made its ruling and her counsel had already submitted on brief comments in support of the petition. Mother has not established she is a party aggrieved on these facts and thus does not have standing to challenge the denial of father's petition on appeal.

To the extent mother is arguing the juvenile court wrongly determined she did not have standing to offer additional evidence in support of father's petition, we find the argument forfeited for failure to object below. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [a reviewing court generally will not consider a challenge to a ruling of an objection that could have been made but was not].) As such, we reject her contention she was

13.

wrongly denied an opportunity to participate in the hearing on father's section 388 petition.

## 2. Grandparents' De Facto Parent Request

Mother also makes several claims asserting error in the court's granting of the grandparents' request to be recognized as de facto parents. She contends the court erred in the way it handled mother's questions regarding its granting of the grandparents' de facto parent request and contends the "manner in which de facto parental status was conferred without substantial discussion or justification reflected a lack of judicial impartiality."

We conclude mother does not have standing to make claims with regard to the court's granting of the grandparents' de facto parent request. A de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 5.502(10).) De facto parent status affords "standing to participate as a party in the dispositional hearing and any hearing thereafter at which the status of the dependent child is at issue" and the ability to be present at the hearing; be represented by counsel; and present evidence. (Cal. Rules of Court, rule 5.534(a)(1)-(3).) They "are not part of any adversarial aspect of a dependency case." (*In re B.F.* (2010) 190 Cal.App.4th 811, 817.) Their "nexus with the proceeding" is a "separate interest and relationship with the child," apart from the parent's efforts to reunify with the child. (*In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) Applying these principles, we conclude the granting of the grandparents' de facto parent status did not affect or prejudice mother's interests, and thus she does not have standing to make challenges to it.

To the extent mother argues the court erred by failing to sufficiently explain the process to her, we reject this claim. She relies on *In re Kieshia E.* (1993) 6 Cal.4th 68 to support this argument. This case does not support mother's claim; it stands for the

14.

proposition that nonparents who have perpetrated abuse onto a minor dependent child cannot be afforded de facto parent status and is inapposite. (*Id*. at pp. 79–80.)

### B.     *Untimely/Forfeited Claims*

Mother's petition goes into great detail about and raises multiple challenges to previous orders. We reject all of mother's contentions regarding previous findings and orders as untimely and not properly before us in this proceeding. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time to file an appeal has passed].)[5]

We further note mother asserts there are numerous alleged inaccuracies in the department's section 366.21, subdivision (e) report, mostly with regard to the department's efforts to communicate with mother and arrange visitation. She contends these inaccuracies and falsities violated several of her constitutional rights, and she proffers screenshots of text messages purported to be between she and the social worker which she contends contradicts statements made in the reports and undermines the general veracity of the reports. At the hearing, however, mother submitted on the reports; none of the inaccuracies she now alleges were before the juvenile court, and her attempt now to contest the information provided in the reports is not a proper subject of our review. (See Cal. Rules of Court, rule 8.452 [writ petitions are to be limited to facts on the record]; see also *In re Zeth S.* (2003) 31 Cal.4th 396, 400 [generally, a reviewing court

---

[5]     Mother has brought several other appeals to various orders throughout the underlying dependency case, three of which are still pending before this court. In *In re W.B.*, case No. F088142, mother appeals from the dispositional order (this case is consolidated with her appeals from orders made at the June 27, 2024 ex parte hearing and an order made on August 13, 2024 granting the care providers permission to get W.B.'s hair cut); in *In re W.B.*, case No. F088736, she appeals from a September 25, 2024 order granting her *Marsden* motion; and in *In re W.B.*, case No. F088974, she appeals from the October 17, 2024 order granting the restraining order against her. To the extent that any of mother's claims about previous orders are timely and properly raised in any of these appeals, this court will consider and resolve them within the appropriate case.

may not consider evidence that is outside the record on appeal and not considered by the trial court].)[6]

Mother also suggests the department's report contained improper bias and subjective reporting. To the extent mother is arguing the report was legally inadequate or defective, we find this claim forfeited for failure to object to the report below. (See *In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

## II. Substantive Claims

### A. *Asserted Barriers to Reunification Services*

Mother contends she faced challenges in enrolling in the substance abuse and parenting components of her case plan. She suggests that because she is a dependent on her parents' health insurance, she was unable to enroll. She asserts, "Despite repeated attempts to coordinate with my parents, my efforts have been stymied by lack of cooperation from them, influenced by misinformation about the ongoing case." With regard to drug testing, she asserts that on June 11, 2024, she received a text message at 12:35 p.m., notifying her she was required to test between 10:00 a.m. and 12:00 p.m. She contends this fact "invalidates the [department's] assertion of non-compliance." Mother also asserts the social worker was biased against her, and, as the social workers were supervising the visits, she was discouraged from participating. She further contends she generally "lacked proper guidance" from the department.

To the extent mother is arguing the court's finding that the department provided reasonable services is not supported by sufficient evidence, her argument fails.

We review the juvenile court's finding of reasonable services for substantial evidence. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.) We review the record in the light most favorable to the court's determinations and draw all

---

[6] We note that mother refers to information outside the record at several points throughout her petition. We reject all claims that rely on information outside the record even if we do not specifically address the claim within the body of this opinion.

reasonable inferences from the evidence to support the findings and orders. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

The standard in determining reasonableness of services is whether they were reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The child welfare department must " 'make a good faith effort' " in implementing the case plan. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.) It must identify the problems leading to the loss of custody, offer services designed to remedy those problems, maintain reasonable contact with the parents during the course of the case plan, and make reasonable efforts to assist the parents in areas where compliance proves difficult. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) Determining the reasonableness of services also includes a review of the parent's willingness to participate in services. (*In re Lynna B.* (1979) 92 Cal.App.3d 682, 702.) While the department is required to maintain reasonable contact, this requires "some degree of cooperation" from the parent. (*In re T.G.* (2010) 188 Cal.App.4th 687, 698.) A parent also has a duty to inform the social worker of any perceived inadequacy of the reunification plan. (See *N.M. v. Superior Court* (2016) 5 Cal.App.5th 796, 808.)

Here, the six-month status review report outlined several efforts to communicate with mother to discuss her progress on her case plan, to no avail. Mother provided no proof of completion of any component of her case plan. Mother had expressed to the social workers at several points throughout the case that she did not want them to contact her and was generally reluctant to participate in both her voluntary and court-ordered case plan. Mother appeared to raise the issue of her insurance to the social worker at one point early in the case to which the social worker encouraged mother to try to continue to get a hold of her father. It does not appear mother brought it up again and made little to no effort to complete any substance abuse or parenting services, which she contends were the services that required insurance. As to mother's assertion that the social workers were biased toward her which kept her from participating in visitation, mother points to no

17.

instance in the record with a citation to support this claim, and we reject it. Contrary to her claim that the social workers were the reason she did not visit, mother only visited W.B. one time throughout the case, during which she behaved inappropriately, and she made several comments throughout the case stating she did not want to visit with W.B. because it would be too difficult for her. While we recognize mother, in her writ petition, contends now that the department's documentation of their attempts to contact her as well as other details are inaccurate, she did not do so at the hearing, and the court only had the report and counsel's arguments to rely on.

Given the state of the evidence, the court's finding that services were reasonable was amply supported.

### B.     *Asserted General Procedural Defects at the Six-Month Review Hearing*

Mother also argues the court's seeking of waivers from the parties regarding the department's late report "undermin[ed] [her] ability to prepare adequately" and participate meaningfully at the hearing. We reject mother's characterization that the court erred by allowing the parties to waive late filing of the department's report. As to the late filing of the report, mother did not lodge an objection to the late filing and has thus forfeited the claim. (See *In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

In any event, while due process may be implicated where a required investigative report is completely omitted, where " 'the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and *does* address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process.' " (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1510.)

Here, mother's counsel clearly indicated she was able to read the report and that she discussed it with mother at length the night before the hearing. Counsel's comments support that mother knew and understood the recommendation and had ample

opportunity to communicate any issues she had with the report to counsel. We find no reversible error with regard to the department's late filing.

Mother next contends the "discourse" regarding her possible firearm possession "shifted quickly without allowing [her] a genuine opportunity to address the claims substantively" and the "queries about firearms possession seemed predisposed towards validating preconceived notions rather than ascertaining the truth, culminating in a continued order against me without a clear basis." She further asserts this showed bias toward her.

We reject mother's claim. The court was attempting to ascertain whether mother had any firearms in order to determine whether any action was needed because she was not present at the hearing on the restraining order where the no firearm order was made. Mother indicated she had no firearms, and as such, no new orders or advisements were made. Mother has not established the court committed any error that prejudiced the outcome of the hearing.

### C.    *Asserted Ineffective Assistance of Counsel*

Mother briefly contends she was provided ineffective assistance of counsel. To this end, she simply argues "the failure to actively contest crucial evidence and the lack of advocacy in my defense severely prejudiced my rights and the outcomes of the hearings."

To prevail on an ineffective assistance of counsel claim, a parent must demonstrate: "(1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficiency resulted in demonstrable prejudice." (*In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1540.) Generally, the proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus. When it is raised in a direct appeal or a writ petition to review a setting order, which is similarly limited to facts in the record, it may be reviewed only "where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (*In re Dennis H.* (2001) 88

19.

Cal.App.4th 94. 98, fn. 1.) "The establishment of ineffective assistance of counsel most commonly requires a presentation which goes beyond the record of the trial…. Action taken or not taken by counsel at a trial is typically motivated by considerations not reflected in the record…. Evidence of the reasons for counsel's tactics, and evidence of the standard of legal practice in the community as to a specific tactic, can be presented by declarations or other evidence filed with the [petition for writ of habeas corpus]." (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243.)

Mother's brief claim does not specify exactly how her counsel's representation fell below an objective standard of reasonableness, nor how it affected the outcome of the proceedings, and it appears to rely on evidence outside the record. Thus, we find mother has not met her burden of showing ineffective assistance of counsel at the six-month review hearing. We also decline to consider her claims of ineffective assistance of counsel from earlier stages in the proceedings. (See *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1159–1160 ["waiver" or forfeiture rule applies to ineffective assistance of counsel claims from stages of dependency proceeding which could have been previously appealed from].)

### D.     *Asserted Cumulative Error*

Mother suggests the cumulative effect of the errors throughout her case resulted in a miscarriage of justice. Because we find mother has not met her burden of demonstrating any error occurred at the section 366.21, subdivision (e) hearing, we reject her claim of cumulative error.

### DISPOSITION

The petition for extraordinary writ and request for a stay are denied. The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

20.